**ROSMAN & GERMAIN LLP**
Daniel L. Germain (State Bar No 143334)
16311 Ventura Boulevard
Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885

*Liaison Counsel for Plaintiffs*

**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**
Eric L. Zagar (State Bar No. 250519)
Michael C. Wagner
Alison K. Clark
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SUPERIOR INDUSTRIES INTERNATIONAL, INC. DERIVATIVE LITIGATION | ) Case No. CV 06-7213 AHS (FMOx) <br> ) <br> ) **VERIFIED SECOND AMENDED** <br> ) **CONSOLIDATED SHAREHOLDER** <br> ) **DERIVATIVE COMPLAINT** <br> ) <br> ) <br> ) **JURY TRIAL DEMANDED** <br> ) <br> ) |

Plaintiffs Gary B. Eldred, Darrel D. Mack and Tom Beatty (collectively, "Plaintiffs"), by the undersigned attorneys, submit this Verified Second Amended

Consolidated Shareholder Derivative Complaint (the "Complaint") against the Defendants (defined herein).

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholders' derivative action brought for the benefit of Nominal Defendant Superior Industries International, Inc. ("Superior" or the "Company") against certain members of its Board of Directors (the "Board") and certain of its executive officers (collectively, the "Defendants," as defined herein) seeking to remedy Defendants' breaches of fiduciary duties, unjust enrichment, statutory violations, and other violations of law.

2.      This action seeks redress for the harm done to Superior, and indirectly to its stockholders, resulting from the self-dealing of certain of the Company's top executives and directors who breached their fiduciary duties of loyalty and good faith to the Company by intentionally manipulating Superior stock option grants between January 1993 (the earliest date for which stock option granting information is publicly available) and October 2002 (when Superior made its last stock option grants before the Sarbanes-Oxley Act became effective) (the "Relevant Period").  As a result of their misconduct, certain defendants have secured a huge windfall for themselves at the expense of Superior and caused the misstatement of Superior's financial results from the Company's fiscal year 1993 through the present, which in turn caused the Company to restate its financial statements to account for $11.1 million in additional compensation expenses.

3.      For at least ten years, Superior's directors, together with its top officers, backdated stock option grants in order to exercise the stock options at a lower strike price, thus pocketing more money than they were otherwise entitled to receive.  A stock option is the right to purchase a stock for a specified period of time at a fixed price, called the "exercise price" or "strike price."  The exercise price is generally fixed to the market price of the stock on the date of grant, pursuant to the Company's shareholder-approved stock option plan.  If the stock's market price exceeds the exercise price, the option holder may

exercise the stock option by purchasing the stock from the Company at the exercise price, reselling it at the higher market price, and profiting from the difference.

4.     The practice of backdating stock options was first publicly disclosed on March 18, 2006, when *The Wall Street Journal* published an article entitled "The Perfect Payday," in which it described stock option backdating practices by a number of companies at which executives had achieved extremely fortuitous stock option paydays, the likelihood of which defied random chance. *The Wall Street Journal*, together with finance professors Erik Lie, of the Tippie College of Business at the University of Iowa, David Yermack, of New York University Stern School of Business, and Professor John Emerson, a statistician at Yale University, studied patterns of stock option grants at certain companies, calculating the probability of such patterns occurring randomly; they concluded that the odds, in many cases, were extremely long. *The Wall Street Journal* noted that executives at certain companies had received stock options dated to coincide with some of the lowest stock prices of the year for several years in a row. The study in the article concluded that the probability of such pattern occurring simply by chance were "astronomical" and, in some cases, as low as one in 300 billion.

5.     This practice of backdating stock options, though widespread, remained virtually undetected until such academic research revealed patterns of stock option grants that could not be explained by chance. These studies noted the frequency with which stock option grants occurred just after a drop in stock price and immediately before the price rose, often at the lowest price of the year or of another fiscal period. Such timing could not be statistically explained by random selection of grant dates. One study hypothesized that the dates of the grants had been selected retroactively. Such retroactive dating, or "backdating" would permit the grantor to select the most advantageous price for the stock option and in effect create an "in-the-money" stock grant (one in which the actual stock price exceeds the option price on the day granted), that would appear as if it was granted while the stock price was low.

6.     Since companies are required to report "in-the-money" grants as

compensation to the recipient and as a charge to the corporation, the practice of backdating would provide a means to confer additional stock value, or compensation, to officers and employees that was not detectable, thereby permitting the Company to conceal the additional compensation and forego reporting or recording the charge.

7.      When the grant date of a stock option is manipulated to an earlier date on which the stock closed at a lower price – *i.e.* when the stock option is "backdated" – the grantee pays less for the stock and the corporation, which sells the stock to the grantee at the option price, receives less when the stock option is exercised.

8.      When stock options are backdated in this manner for the benefit of insiders (as they were in this case), the stated purpose behind a stock option plan – to strengthen the Company's ability to hire and retain key employees and motivate such employees to remain focused on long-term stockholder value performance – is undermined to the detriment of the Company and its shareholders. Backdated stock options are already "in-the-money" at the time they are granted, and the directors and officers deliberately cause the Company to mislead both its shareholders and governmental regulators by falsely claiming in its regulatory filings that the stock options were actually granted on the stated date.

9.      The academic research did not identify specific companies that had engaged in these practices, although it triggered increased scrutiny by the Securities and Exchange Commission ("SEC") and other government officials.

10.     For example, on September 6, 2006, the United States Senate Committee on Finance ("Finance Committee") held a hearing on "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits." At the hearing, Former Finance Committee Chairman, Senator Chuck Grassley, in his opening statement, stated: "[options backdating] is behavior that, to put it bluntly, is disgusting and repulsive. It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm

going to get mine.' . . . [S]hareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called 'back-dating' – to further enrich themselves.  And as we have found far too often in corporate scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves. . . ."

11.   Defendants' backdating at Superior first came to light on November 9, 2006, when Gary B. Eldred filed the first shareholder derivative complaint against Defendants on behalf of Superior after an investigation into Superior's past options granting practices.

12.   The investigation revealed that from 1993 through 2002 a majority of Superior directors, together with its top officers, granted undisclosed, "in-the-money" stock options to themselves and others by backdating stock option grants to coincide with historically low closing prices of Superior's common stock.

13.   Based on the Company's publicly disclosed documents, including Form 3s, Form 4s, Form 5s and proxy statements, stock options were granted to Company officers and directors on 24 dates between 1993 and 2002.  Of these 24 dates, Plaintiffs identify options granted on *nine dates*, or 37.5%, as being backdated.  Each of these nine grant dates coincides with a particularly low price:

    a.   January 4, 1993 was (1) the lowest closing price of the month of January 1993; (2) the lowest price of the fiscal quarter ended March 31, 1993; and (3) *the lowest closing price for Superior common stock for the entire Fiscal Year 1993*;

    b.   May 31, 1994 was (1) the second lowest closing price of the Company's stock for the month of May 1994; and (2) the third lowest closing price of the Company's stock for the quarter ended June 30, 1994;

    c.   February 1, 1995 was (1) the second lowest closing price of the Company's stock for the month of February 1995; (2) the third lowest closing price of the Company's stock for the quarter ended March 31, 1995; and (3) *the third lowest closing price for Superior common stock for the entire Fiscal Year 1995*;

    d.   April 14, 1997 was (1) the lowest closing price of the Company's stock

- 5 -

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

for the month of April 1997; (2) the lowest closing price of the Company's stock for the quarter ended June 30, 1997; and (3) *the second lowest closing price for Superior common stock for the entire Fiscal Year 1997*;

    e. September 3, 1998 was (1) the second lowest closing price of the Company's common stock for the month of September 1998; (2) the second lowest closing price of the Company's common stock for the quarter ended September 30, 1998; and (3) *the second lowest closing price of Superior's common stock for the entire Fiscal Year 1998*;

    f. September 24, 1999 was (1) the lowest closing price for the Company's common stock for the month of September 1999; and (2) *the lowest closing price for Superior common stock for the entire quarter ended September 30, 1999*;

    g. September 20, 2000 was (1) the lowest closing price of the Company's common stock for the month of September 2000; and (2) preceded a substantial rise in the price of the Company's common stock, which did not fall below the exercise price for the remainder of the Relevant Period;

    h. September 20, 2001 was (1) the lowest closing price of the Company's common stock for the month of September 2001; (2) the lowest closing price of the Company's common stock for the quarter ended September 30, 2001; and (3) *the lowest closing price of Superior common stock for the entire Fiscal Year 2001*; and

    i. October 9, 2002 was (1) the lowest closing price of the Company's common stock for the month of October 2002; (2) the lowest closing price of the Company's common stock for the quarter ended December 31, 2002; and (3) *the lowest closing price of Superior common stock for the entire Fiscal Year 2002.*

  14. Moreover, the Company's internal investigation confirmed that backdating occurred at Superior.  On April 10, 2007, the Company filed with the SEC its 10-K for the year ended December 31, 2006.  Therein, the Company disclosed the results of Superior's internal investigation into the Company's historical stock option granting practices and *admitted* that "in several instances" stock options had been backdated.  The "Review

Team," which consisted of the Audit Committee, Superior's outside counsel and forensic accounting experts evaluated the 52 identified grant dates that occurred between 1997 and 2006 as well as "certain option grants for the time period between 1991 and 1996," and concluded that *"for most option grants, there were deficiencies in the process of granting, documenting or accounting for stock options, including in several instances retrospectively obtaining lower exercise prices and granting options to new employees at prices set before their actual hire dates.* These errors resulted in our using incorrect measurement dates for financial reporting purposes. This means that the option exercise price was not the market price of the option shares on the actual grant date of the option, but instead was a lower market price on an earlier date." (Emphasis added.)

15.    By backdating stock options, as detailed herein, the members of the Board were able to conceal that Superior was materially under-reporting the Company's compensation expenses and was materially overstating the Company's net income and earnings for at least fiscal years 1993 through 2005. In addition to being unjustly enriched by the mere receipt of such backdated options, certain of Defendants also collectively realized millions of dollars in illicit proceeds through the exercise of these illegally backdated options grants and subsequent sales of Superior stock.

16.    By contrast, Superior has suffered, and will continue to suffer, significant financial and non-monetary damages and injuries, several of which were identified in a report issued by the Center for Financial Research and Analysis on May 16, 2006, entitled "Options Backdating – Which Companies Are at Risk?":

- SEC investigation risk – The SEC has begun informal investigations at many companies in recent months and has also begun to call for improved disclosures around all areas of executive compensation.

- Accounting restatement risk – Some companies which have admitted backdating options have accompanied those admissions with financial restatements impacting both the balance sheet and earnings.

- Tax/Cash implications – The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

- Management credibility risk – If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholder, the reputation of management (and the related stock premium for superior management) could take a hit.

17.    Superior has already suffered several of these injuries.  For example, in its Form 10-K filed with the SEC on April 10, 2007, Superior **admitted** that the Company's past option grants had been improperly dated and that, as a result, it was forced to restate its past financial statements.   Specifically, the Company announced that its internal investigation of historical stock option grants, commenced in response to the derivative complaints filed by Plaintiffs Gary B. Eldred and Darrel D. Mack, revealed that "for most option grants, there were deficiencies in the process of granting, documenting or accounting for stock options, including in several instances retrospectively obtaining lower exercise prices and granting options to new employees at prices set before their actual hire dates."  In addition, Superior admitted that "for certain option grants, *we selected a grant date retrospectively to obtain a lower exercise price*; and [f]or certain option grants, we awarded new employees options *prior to their actual start date to obtain a lower exercise price.*"  (Emphasis added.)

18.    Thus, Superior has **admitted** that its directors approved stock option grants that were backdated for the purpose of "obtaining lower exercise prices" and, indeed, granted backdated stock options as rewards to new and then-current employees.

19.    Further, Defendants misrepresented facts presented in the Company's proxy statements soliciting action by shareholders, and in press releases and documents filed with the SEC, specifically quarterly and year-end reports.  For example, since at least April 1, 1994, notwithstanding their knowing and intentional backdating of stock option

---

grants to "obtain lower exercise prices," Defendants falsely represented that the Company, through its stock option plans, issued stock options at an amount which was equal to the "market value (closing price on the New York Stock Exchange – Composite Transactions of the Company's common stock) on the date of grant."

20.   In fact, "most" of the Company's stock options were granted on dates different from the stated grant dates, when the stock's market value was also different, and lower, from the stated exercise prices, and were also backdated specifically to obtain a lower exercise price.

21.   Superior shareholders routinely relied upon the false proxy statements issued by the Company. Shareholders also voted to approve the Company's stock option plans, which the Defendants exploited by manipulating and backdating stock option grants in order to enrich themselves at the expense of the Company and its shareholders.

22.   The Defendants knew, but failed to disclose, that they had backdated stock option grants in a manner designed to create immediate and risk-free profits for the recipients in direct contravention of the Company's stated and shareholder-approved stock option plans and proxy statements filed with the SEC. Furthermore, the Defendants knew that because the Company had not taken the required compensation expense for granting "in-the-money" stock options, Superior's reported earnings and expenses were false, misleading and not in compliance with the Generally Accepted Accounting Principles ("GAAP"). Thus, by falsifying the date on which options were granted, the Defendants materially understated Superior's expenses, overstated its income and falsely represented that it had not incurred any expenses for option grants.

23.   In sum, as alleged in detail herein, in gross breach of their fiduciary duties as officers and/or directors of Superior, the Defendants colluded with one another to:

    a.   improperly backdate all nine stock option grants made to multiple Superior top executives and directors from 1993 through 2002 and disclosed in the Company's proxy statements, in violation of the Company's shareholder-approved stock option

plans;

b.   improperly record and account for the backdated stock options, in violation of GAAP;

c.   improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and

d.   improperly and in bad faith seek shareholder approval of amendments to the various stock option plans.

24.   As a result of Defendants' egregious misconduct, Superior has sustained millions of dollars in damages.

## JURISDICTION AND VENUE

25.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

26.   This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), in that complete diversity of citizenship exists between Plaintiffs Eldred and Mack on the one hand and Defendants on the other hand, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

27.   Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the Defendants either resides in or maintains executive offices in this district, and the Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

//

//

## PARTIES

### Plaintiffs

28.     Plaintiff Gary B. Eldred ("Eldred") is, and was at all relevant times, a shareholder of Nominal Defendant Superior. Plaintiff Eldred purchased Superior common stock in January 1996, has continuously held stock in Superior throughout the wrongs complained of and continues to hold his shares of Superior common stock. Plaintiff Eldred is a citizen of the State of Vermont.

29.     Plaintiff Darrel D. Mack ("Mack") is, and was at all relevant times, a shareholder of Nominal Defendant Superior. Plaintiff Mack purchased Superior common stock in March 1991, has continuously held stock in Superior throughout the wrongs complained of and continues to hold his shares of Superior common stock. Plaintiff Mack is a citizen of the State of Washington.

30.     Plaintiff Tom Beatty ("Beatty") is, and was at all relevant times, a shareholder of Nominal Defendant Superior. Plaintiff Beatty inherited Superior common stock in July 1985, has continuously held stock in Superior throughout the wrongs complained of and continues to hold his shares of Superior common stock. Plaintiff Beatty is a citizen of the State of California.

### Nominal Defendant

31.     Nominal Defendant Superior is a California corporation with its principal place of business and executive offices located at 7800 Woodley Avenue, Van Nuys, California 91406. According to its public filings, Superior designs and manufactures aluminum road wheels for sale to original equipment manufacturers. Superior has had more than 500 shareholders of record at all relevant times hereto.

### Defendants

32.     Defendant Robert H. Bouskill ("Bouskill") has served as the Company's Senior Vice President, Manufacturing Technology since 2005. Bouskill also served in various capacities since he joined the Company in 1995, including as a Vice President, Manufacturing Technology from 2000 to 2005. Bouskill also received personal financial

benefits in the form of at least 15,250 backdated options. He also sold 18,750 shares of Superior stock, for unlawful insider trading proceeds of at least $766,017.50, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws. Upon information and belief, Bouskill is a citizen of the State of California.

33.   Defendant Michael D. Dryden ("Dryden") served as the Company's Vice President, International Business Development from March 1990 until 2003. Dryden also received personal financial benefits in the form of at least 13,250 backdated options. He also sold 10,175 shares of Superior stock, for unlawful insider trading proceeds of at least $358,090.25, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws. Upon information and belief, Dryden is a citizen of the State of California.

34.   Defendant Ronald F. Escue ("Escue") served as the Company's Vice President, General Manager – Aftermarket Wheels from January 1995 to 2000. Escue also served in various capacities since he joined the Company in September 1975, including as Vice President, Aftermarket Sales from January 1987 to January 1995. Escue also received personal financial benefits in the form of at least 3,000 backdated options. He also sold 4,500 shares of Superior stock, for unlawful insider trading proceeds of at least $131,058.75, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws. Upon information and belief, Escue is a citizen of the State of California.

35.   Defendant Emil J. Fanelli ("Fanelli") has served as the Company's Vice President and Corporate Controller since 2001 and as the acting Chief Financial Officer since May 2007. Fanelli also served in various capacities since he joined the Company in 1997. Fanelli also received personal financial benefits in the form of at least 10,250 backdated options. He also sold 14,000 shares of Superior stock, for unlawful insider trading proceeds of at least $591,780, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws. Upon information and belief, Fanelli is a citizen of the State of California.

36.     Defendant James M. Ferguson ("Ferguson") has served as the Company's Senior Vice President, Global Sales and Marketing since March 2003.  Ferguson also served in various capacities since he joined the Company in 1977, including as an OEM Sales Engineer from 1977 to 1984, Vice President – OEM Marketing from 1984 to 1990, and as the Company's Vice President, OEM Marketing Group from 1990 to 2003. Ferguson also received personal financial benefits in the form of at least 58,000 backdated options.  He also sold 40,682 shares of Superior stock, for unlawful insider trading proceeds of at least $1,270,401.21, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws.  Upon information and belief, Ferguson is a citizen of the State of California.

37.     Defendant Parveen Kakar ("Kakar") has served as the Company's Vice President, Program Development since 2003.  Kakar also served in various capacities since he joined the Company in 1989, including as Director, Engineering Services.  Kakar also received personal financial benefits in the form of at least 12,000 backdated options. Upon information and belief, Kakar is a citizen of the State of California.

38.     Defendant Iftikhar H. Kazmi ("Kazmi") served in various positions during his employment with the Company from 1989 to December 1994, including as the Company's Senior Vice President, Midwest Group.  Kazmi also received personal financial benefits in the form of at least 25,000 backdated options.  Upon information and belief, Kazmi is a citizen of the State of California.

39.     Defendant William B. Kelley ("Kelley") has served as the Company's Vice President, Operations since 2004.  Kelley also served in various capacities since he joined the Company in 1993, including as Vice President, Operations and Quality from 1998 to 2004.  Kelley also received personal financial benefits in the form of at least 30,000 backdated options.  He also sold 9,500 shares of Superior stock, for unlawful insider trading proceeds of at least $319,960, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws.  Upon information and belief, Kelley is a citizen of the State of California.

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

40.     Defendant Daniel L. Levine ("Levine") has served as the Company's Vice President since 2006 and as Corporate Secretary and Treasurer since 1997.  Levine also received personal financial benefits in the form of at least 17,875 backdated options.  He also sold 22,625 shares of Superior stock, for unlawful insider trading proceeds of at least $877,342.50, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws.  Upon information and belief, Levine is a citizen of the State of California.

41.     Defendant Henry C. Maldini ("Maldini") served as the Company's Vice President, Engineering from June 1986 to January 1999.  Maldini also served in various capacities since he joined the Company in 1975, including as Assistant Vice President, Engineering.  Maldini also received personal financial benefits in the form of at least 13,000 backdated options.  He also sold 3,000 shares of Superior stock, for unlawful insider trading proceeds of at least $72,000, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws.  Upon information and belief, Maldini is a citizen of the State of California.

42.     Defendant Frank Monteleone ("Monteleone") served as the Company's Vice President, Purchasing from 1996 until 2004.  Monteleone also served in various capacities since he joined the Company in 1986, including as a Corporate Purchasing Director.  Monteleone also received personal financial benefits in the form of at least 27,750 backdated options.  He also sold 26,750 shares of Superior stock, for unlawful insider trading proceeds of at least $974,715, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws.  Upon information and belief, Monteleone is a citizen of the State of California.

43.     Defendant Michael J. O'Rourke ("O'Rourke") has served as the Company's Senior Vice President, Sales and Administration since 2003.  O'Rourke also served in various capacities since he joined the Company in 1987, including as Vice President, OEM Program Administration from July 1995 to 2003 and as Director, OEM Programs from 1991 to 1995.  O'Rourke also received personal financial benefits in the form of at least

44,500 backdated options.  He also sold 10,000 shares of Superior stock, for unlawful insider trading proceeds of at least $410,340, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws.  Upon information and belief, O'Rourke is a citizen of the State of California.

44.    Defendant Delbert J. Schmitz ("Schmitz") served as the Company's Vice President, Aftermarket Marketing from January 1987 until 2003 and as Vice President, Sales from 1972 to January 1987.  Schmitz also received personal financial benefits in the form of at least 6,250 backdated options.  He also sold 6,250 shares of Superior stock, for unlawful insider trading proceeds of at least $234,050, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws.  Upon information and belief, Schmitz is a citizen of the State of California.

45.    Defendant Sheldon I. Ausman ("Ausman") has served as a director of the Company since 1992.  Ausman has also served on the Audit Committee of the Board ("Audit Committee") since at least 1995 and on the Compensation and Benefits Committee of the Board ("Compensation and Benefits Committee") since it was formed in 2004.  Ausman also served on the Stock Option Committee of the Board ("Stock Option Committee") from at least 1993 to 1994 and from 1998 until 2003 and on the Compensation Committee of the Board ("Compensation Committee") from at least 1993 to 2003.  As a member of the Stock Option Committee, Ausman approved the stock option grants to Company directors (including, in some instances, himself) and executives on January 4, 1993, May 31, 1994, September 3, 1998, September 24, 1999, September 20, 2000, September 20, 2001 and October 9, 2002.  Ausman also approved stock option grants to himself on September 3, 1998, September 24, 1999, September 20, 2000, September 20, 2001 and October 9, 2002 and received personal financial benefits in the form of at least 8,000 backdated options.  He also sold 10,000 shares of Superior stock, for unlawful insider trading proceeds of at least $291,300, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws.  Upon information and belief, Ausman is a citizen of the State of California.

46.   Defendant Raymond C. Brown ("Brown") served as a director of the Company from 1972 to December 2006.  Brown also served the Company in various executive capacities from 1967 until he retired in 1998, including as Senior Vice President from 1975 until 1998.  Brown also received personal financial benefits in the form of at least 75,500 backdated options. He also sold 84,706 shares of Superior stock, for unlawful insider trading proceeds of at least $2,265,268.13, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws.  Upon information and belief, Brown is a citizen of the State of California.

47.   Defendant Louis L. Borick ("L. Borick") has served as Chairman of the Board since he founded the Company in 1957.  L. Borick also served as Chief Executive Officer ("CEO") of the Company from January 2003 to January 2005, and President from 1957 to January 2003.  L. Borick also received personal financial benefits in the form of at least 200,000 backdated options.  He also sold 760,150 shares of Superior stock, for unlawful insider trading proceeds of at least $36,951,949.50, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws.  L. Borick is the father of defendant Steven J. Borick.  Upon information and belief, L. Borick is a citizen of the State of California.

48.   Defendant Steven J. Borick ("S. Borick") has served as President and Chief Operating Officer of the Company since January 2003, and as CEO since January 2005.  S. Borick also served in various capacities since he joined the Company in January 1999, including as the Company's Vice President, Strategic Planning from March 1999 to January 2000, and as Executive Vice President from January 2000 to January 2003.  S. Borick has also served as a director of the Company since 1981, and served on the Audit Committee from 1994 to 1997 and the Stock Option Committee from 1993 to 1997.  As a member of the Stock Option Committee, S. Borick granted the stock options purportedly made on January 4, 1993, May 31, 1994, February 1, 1995 and April 14, 1997.  S. Borick also received personal financial benefits in the form of at least 182,000 backdated options.  He also sold 35,000 shares of Superior stock, for unlawful insider trading proceeds of at

least $1,548,101, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws. S. Borick is the son of defendant L. Borick. Upon information and belief, S. Borick is a citizen of the State of California.

49.   Defendant Philip W. Colburn ("Colburn") has served as a director of the Company since 1991. Colburn has served on the Audit Committee since at least 1993 and on the Compensation and Benefits Committee since 2004. Colburn also served on the Stock Option Committee from 1998 to 2003.   As a member of the Stock Option Committee, Colburn granted the stock options purportedly made on September 3, 1998, September 24, 1999, September 20, 2000, September 20, 2001 and October 9, 2002, which included grants to himself on September 3, 1998, September 24, 1999, September 20, 2000, September 20, 2001 and October 9, 2002. Colburn also received personal financial benefits in the form of at least 9,000 backdated options. He also sold 5,000 shares of Superior stock, for unlawful insider trading proceeds of at least $182,390, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws. Upon information and belief, Colburn is a citizen of the State of California.

50.   Defendant V. Bond Evans ("Evans") has served as a director of the Company since 1994 and on the Compensation and Benefits Committee since 2004. Evans also served on both the Stock Option Committee and the Compensation Committee from at least 1995 to 2003. As a member of the Stock Option Committee, Evans granted the stock options purportedly made on February 1, 1995, April 14, 1997, September 3, 1998, September 24, 1999, September 20, 2000, September 20, 2001 and October 9, 2002, which included grants to himself on September 3, 1998, September 24, 1999, September 20, 2000, September 20, 2001 and October 9, 2002. Evans also received personal financial benefits in the form of at least 8,000 backdated options. He also sold 5,000 shares of Superior stock, for unlawful insider trading proceeds of at least $243,550, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws. Upon information and belief, Evans is a citizen of the State of California.

51.   Defendant R. Jeffrey Ornstein ("Ornstein") served as the Company's Vice

President and Chief Financial Officer from 1995 until May 2007 and as a director of the Company from 1991 until May 2007.   Ornstein also served as the Company's Vice President, Finance and Treasurer from June 1984 to 1995. Ornstein also received personal financial benefits in the form of at least 61,250 backdated options.  He also sold 48,150 shares of Superior stock, for unlawful insider trading proceeds of at least $1,843,281.50, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws.  Upon information and belief, Ornstein is a citizen of the State of California.

52.     Defendant Jack H. Parkinson ("Parkinson") served as a director of the Company from 1983 to December 2006.  Parkinson also served on the Audit Committee from 1998 to December 2006, on the Compensation and Benefits Committee from 2004 to December 2006 and on the Compensation Committee from at least 1993 to 2003. Parkinson also received personal financial benefits in the form of at least 9,000 backdated options.   He also sold 15,621 shares of Superior stock, for unlawful insider trading proceeds of at least $471,501.13, in violation of California Corporations Code §§ 25402 and 25502.5 and federal securities laws.   Upon information and belief, Parkinson is a citizen of the State of California.

53.     Collectively, defendants Bouskill, Dryden, Escue, Fanelli, Ferguson, Kakar, Kazmi, Kelley, Levine, Maldini, Monteleone, O'Rourke, Schmitz, Ausman, Brown, L. Borick, S. Borick, Colburn, Evans, Ornstein and Parkinson are referred to herein as the "Defendants."

### Director Defendants

54.     Collectively, defendants Ausman, Brown, L. Borick, S. Borick, Colburn, Evans, Ornstein and Parkinson are referred to herein as the "Director Defendants."

### DUTIES OF THE DEFENDANTS

55.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control

and manage the Company in a fair, just, honest, and equitable manner. The Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

56. The Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

57. To discharge their duties, the Defendants, as the officers and directors of the Company, were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the Defendants were required to, among other things:

    a.    exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

    b.    exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

    c.    exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial

condition of the Company;

    d.    exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

    e.    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

58.    The Defendants, particularly the executive officers and the members of the Audit Committee at various relevant times, including Defendants Colburn, S. Borick, Ausman and Parkinson, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Defendants were required to:

    (1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

    (2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

        (a)    transactions are executed in accordance with management's general or specific authorization; and

        (b)    transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

59.    Further, Superior's Audit Committee Charter provides that the Audit Committee members, which at various relevant times included Defendants Colburn, S. Borick, Ausman and Parkinson, shall be responsible to, among other things:

    a.    review the results of the annual audit. The Committee is to discuss the annual report on Form 10-K and other financial

reports prepared by Management (including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations") filed with the SEC, the New York Stock Exchange or sent to stockholders, and the results of the audit with the Company's external auditors and Management, including the review of any audit problems or difficulties encountered by the external auditor and Management's response;

b.    review Management's disclosure as to the effectiveness of disclosure controls and procedures, all significant deficiencies in the design or operation of the internal controls, and any fraud, whether material or not, involving Management or other employees who have a significant role in internal controls;

c.    prior to filing with the SEC, review interim financial statements that have been reviewed by the Company's external auditors, and discuss with Management and the external auditors the interim financial information included in the Company's Form 10-Q;

d.    inquire of Management as to the existence of and reasons for any other significant accounting accruals, reserves or estimates that have or may have a material impact on the financial statements; and

e.    review with Management all significant reports sent to regulatory agencies, including all SEC reports.

## FACTUAL ALLEGATIONS

### Background of the Stock Option Backdating Scandal

60.    Under accounting rules in effect prior to 2004, public companies in the United States were permitted to grant stock options to employees without recording an expense, so long as the option's strike price was at or above the market's closing price for the stock

on the day the options were granted. If the option granted was priced below the market price on the date granted, making it an "in-the-money" option grant, SEC regulations required that any publicly traded company recognize and record the difference as a compensation expense in its financial statements. *See, e.g.*, Accounting Principles Board Opinion No. 25 ("APB 25), superseded in 2004 by FAS 123(R).[1] Accounting rules also required that companies recognize the same compensation expense if "in-the-money" options were granted to non-employees. Thus while "in-the-money" stock options are more valuable to those to whom they are granted, the additional expenses, if disclosed, reduce the total amount of net income reported to shareholders of a publicly traded company.

61.    In addition, pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's most highly compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors; (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation; and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

62.    Since the date of *The Wall Street Journal* article which first revealed the illegal practice of backdating stock options, more than 130 companies have reported internal and/or governmental investigations of their backdating practices. *Perfect Payday Options Scorecard, The Wall Street Journal* (updated regularly, available at http://online.wsj.com/public/resources/documents/info-optionsscore06-full.html).

---

[1] Pursuant to APB 25, the applicable GAAP provision at the time of the stock option grants enumerated herein, if the market price on the date of grant exceeds the exercise price of the options, the Company was required to recognize the difference as an expense.

63.     Revelations of backdated stock options have been made by companies across several business sectors and geographic regions.  A disproportionate number of these revelations, however, have come from technology companies in California, where stock options are frequently used to attract employees and increasingly lavished upon executives.  Rank and file employees who received backdated options have now found themselves subject to unforeseen tax liabilities and, in some instances, barred from exercising their own vested securities.  As reported by the San Jose Mercury News:

> Across Silicon Valley and the nation, hundreds of thousands of workers who played no role in manipulating options nonetheless could pay a price, from lost stock options and lost investment opportunities to looming tax bills.  And dozens of companies have imposed indefinite "blackout" periods .... While companies struggle to restate past earnings and report current financial results.

Mark Schwanhausser, *Average Worker Takes A Hit: Tax Bill Headaches Looming For Rank-and-File*, San Jose Mercury News, January 29, 2007, available online at http://www.mercurynews.com/search/ci_5110094.

64.     As the scrutiny has intensified, backdating has been revealed not only as a practice to maximize the grant recipients' gain, while concealing company expenses, but also as a tax avoidance vehicle for some executives.  Reporting on an analysis written by an economist at the SEC, the San Jose Mercury News reported, "[i]n a new wrinkle in the scandal over backdating stock options, an analyst has found evidence that some executives manipulated the exercise dates of their options in order to cheat on their taxes."  Marcy Gordon, SEC: Backdating Done to Avoid Paying More Taxes, San Jose Mercury News, December 13, 2006, available online at http://www.mercurynews.com/search/ci_4831931.

### Option Grants at Superior

65.     The following chart contains the publicly disclosed stock option grants at Superior during the Relevant Period:

//

//

//

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| 1/4/1993<br><br>Options granted at $19.08 | Yes | Raymond C. Brown | | 37,500 | Proxy Statement filed April 1, 1994 |
| | Yes | Joseph T. D'Amico[2] | Incentive Stock Options | 3,375 | Form 5 filed February 23, 2000 |
| | Yes | Michael D. Dryden | Incentive Stock Options | 750 | Form 4 filed September 14, 1999 |
| | Yes | James M. Ferguson | Incentive Stock Options[3] | 6,852 | Proxy Statement filed April 1, 1994 |
| | Yes | James M. Ferguson | Non-Qualified Stock Options[4] | 648 | Proxy Statement filed April 1, 1994 |
| | Yes | Iftikhar H. Kazmi | | | Proxy Statement filed April 1, 1994 |

[2] Pursuant to this Court's June 20, 2007 order, Joseph T. D'Amico has been dismissed from this action with prejudice. Plaintiffs have included his filing information to fully reflect the Company's publicly disclosed grant history during the Relevant Period.

[3] Disclosed as Incentive Stock Options in Form 4 filed on October 6, 1999.

[4] Disclosed as Non-Qualified Stock Options in Form 4 filed on October 6, 1999.

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| | Yes | Daniel L. Levine | Incentive Stock Options | 375 | Form 4 filed January 10, 2000 |
| | Yes | Frank Monteleone | Incentive Stock Options | 1,500 | Form 5 filed on February 23, 2000 |
| | Yes | Robert J. Ornstein | Incentive Stock Options | 11,250 | Proxy Statement filed April 1, 1994 |
| | Yes | Michael J. O'Rourke | Incentive Stock Options | 1,500 | Form 5 filed on February 23, 2000 |
| | Yes | Delbert J. Schmitz | Incentive Stock Options | 2,250 | Form 5 filed on February 23, 2000 |
| 3/1/1993 Options granted at $23.83 | No | William B. Kelley | Incentive Stock Options[5] | 1,500 | Form 3 filed on February 22, 1999 |
| 3/9/1993 Options granted at $25.42 | No | Louis L. Borick | Non-Qualified Stock Options[6] | 750,000 | Proxy Statement filed April 1, 1994 |

[5] Disclosed as Incentive Stock Options in Form 5 filed on February 23, 2000.
[6] Disclosed as Non-Qualified Stock Options in Form 4 filed on January 10, 2000.

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| 5/31/1994<br><br>Options granted at $31.00 | Yes | Raymond C. Brown | | 15,000 | Proxy Statement filed March 30, 1995 |
| | Yes | James M. Ferguson | | 5,000 | Proxy Statement filed March 30, 1995 |
| | Yes | Iftikhar H. Kazmi | | 10,000 | Proxy Statement filed March 30, 1995 |
| | Yes | Henry C. Maldini | | 5,000 | Proxy Statement filed March 30, 1995 |
| | Yes | Robert J. Ornstein | | 10,000 | Proxy Statement filed March 30, 1995 |
| 2/1/1995<br><br>Options granted at $24.50 | Yes | Raymond C. Brown | Incentive Stock Options[7] | 15,000 | Proxy Statement filed March 28, 1996 |

---

[7] Disclosed as Incentive Stock Options in Form 5 filed on February 23, 2000.

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| | Yes | Philip W. Colburn | Non-Qualified Stock Options | 1,000 | Form 5 filed on February 23, 2000 |
| | Yes | Joseph T. D'Amico | Incentive Stock Options | 2,500 | Form 5 filed on February 23, 2000 |
| | Yes | Michael D. Dryden | Incentive Stock Options | 1,000 | Form 4 filed on September 14, 1999 |
| | Yes | Ronald F. Escue | Incentive Stock Options | 2,000 | Form 4 filed on October 6, 1999 |
| | Yes | James M. Ferguson | Incentive Stock Options[8] | 5,000 | Proxy Statement filed March 28, 1996 |
| | Yes | William B. Kelley | Incentive Stock Options[9] | 2,000 | Form 3 filed on February 22, 1999 |
| | Yes | Daniel L. Levine | Incentive Stock Options | 1,000 | Form 4 filed on January 10, 2000 |
| | Yes | Henry C. Maldini | | 5,000 | Proxy Statement filed March 28, 1996 |

---

[8] Disclosed as Incentive Stock Options in Form 4 filed on October 6, 1999.
[9] Disclosed as Incentive Stock Options in Form 5 filed on February 23, 2000.

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| | Yes | Frank Monteleone | Incentive Stock Options | 2,000 | Form 5 filed on February 23, 2000 |
| | Yes | Robert J. Ornstein | Incentive Stock Options[10] | 7,827 | Proxy Statement filed March 28, 1996 |
| | Yes | Robert J. Ornstein | Non-Qualified Stock Options[11] | 2,173 | Proxy Statement filed March 28, 1996 |
| | Yes | Michael J. O'Rourke | Incentive Stock Options | 2,500 | Form 5 filed on February 23, 2000 |
| | Yes | Jack H. Parkinson | Non-Qualified Stock Options | 1,000 | Form 4 filed on September 21, 1999 |
| | Yes | Delbert J. Schmitz | Incentive Stock Options | 2,000 | Form 5 filed on February 23, 2000 |
| 12/7/1995 Options granted at $24.75 | No | Daniel L. Levine | Incentive Stock Options | 5,000 | Form 4 filed on January 10, 2000 |

[10] Disclosed as Incentive Stock Options in Form 5 filed on February 23, 2000.
[11] Disclosed as Non-Qualified Stock Options in Form 5 filed on February 23, 2000.

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| 7/22/1996 Options granted at $23.25 | No | Frank Monteleone | Incentive Stock Options | 2,000 | Form 5 filed on February 23, 2000 |
| 8/27/1996 Options granted at $23.25 | No | Robert H. Bouskill | Incentive Stock Options | 2,250 | Form 3 filed on November 8, 2000 |
|  | No | Michael J. O'Rourke | Incentive Stock Options | 2,000 | Form 5 filed on February 23, 2000 |
| 8/30/1996 Options granted at $23.25 | No | Sheldon I. Ausman | Non-Qualified Stock Options | 6,000 | Form 5 filed on February 23, 2000 |
|  | No | Steven J. Borick | Non-Qualified Stock Options | 6,000 | Form 4 filed on January 10, 2000 |
|  | No | V. Bond Evans | Non-Qualified Stock Options | 3,000 | Form 5 filed on February 23, 2000 |
| 10/25/1996 Options granted at $20.00 | No | V. Bond Evans | Non-Qualified Stock Options | 5,000 | Form 5 filed on February 23, 2000 |

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| 4/14/1997<br><br>Options granted at $22.63 | Yes | Robert H. Bouskill | Incentive Stock Options | 2,250 | Form 3 filed on November 8, 2000 |
| | Yes | Michael D. Dryden | Incentive Stock Options | 1,000 | Form 4 filed on September 14, 1999 |
| | Yes | James M. Ferguson | Incentive Stock Options[12] | 3,000 | Proxy Statement filed on March 19, 1998 |
| | Yes | William B. Kelley | Incentive Stock Options | 3,000 | Form 3 filed on February 22, 1999 |
| | Yes | Daniel L. Levine | Incentive Stock Options[13] | 1,000 | Form 4 filed on January 10, 2000 |
| | Yes | Henry C. Maldini | | 3,000 | Proxy Statement filed on March 19, 1998 |
| | Yes | Frank Monteleone | Incentive Stock Options | 3,000 | Form 5 filed on February 23, 2000 |

[12] Disclosed as Incentive Stock Options in Form 4 filed on October 6, 1999.

[13] Disclosed as Incentive Stock Options in Form 5 filed on February 23, 2000.

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| | Yes | Robert J. Ornstein | Incentive Stock Options[14] | 4,560 | Proxy Statement filed on March 19, 1998 |
| | Yes | Robert J. Ornstein | Non-Qualified Stock Options[15] | 440 | Proxy Statement filed on March 19, 1998 |
| | Yes | Michael J. O'Rourke | Incentive Stock Options | 3,000 | Form 5 filed on February 23, 2000 |
| 9/26/1997<br><br>Options granted at $27.13 | No | Emil J. Fanelli | Incentive Stock Options | 2,000 | Form 5 filed on February 23, 2000 |
| 1/28/1998<br><br>Options granted at $25.94 | No | Parveen Kakar | Incentive Stock Options | 1,000 | Form 3 filed on February 13, 2004 |

---

[14] Disclosed as Incentive Stock Options in Form 5 filed on February 23, 2000.

[15] Disclosed as Non-Qualified Stock Options in Form 5 filed on February 23, 2000.

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| 5/18/1998<br><br>Options granted at $30.00 | No | Delbert J. Schmitz | Incentive Stock Options | 2,000 | Form 5 filed on March 20, 2001 |
| 6/15/1998<br><br>Options granted at $26.31 | No | Delbert J. Schmitz | Incentive Stock Options | 2,000 | Form 5 filed on March 20, 2001 |
| 9/3/1998<br><br>Options granted at $20.63 | Yes | Sheldon I. Ausman | Non-Qualified Stock Options | 2,000 | Form 5 filed on February 22, 1999 |
|  | Yes | Steven J. Borick | Non-Qualified Stock Options | 2,000 | Form 4 filed on February 12, 1999 |
|  | Yes | Robert H. Bouskill | Incentive Stock Options | 3,000 | Form 3 filed on November 8, 2000 |
|  | Yes | Raymond C. Brown | Non-Qualified Stock Options | 2,000 | Form 5 filed on February 22, 1999 |
|  | Yes | Philip W. Colburn | Non-Qualified Stock Options | 2,000 | Form 5 filed on February 22, 1999 |
|  | Yes | Joseph T. D'Amico | Incentive Stock Options | 2,000 | Form 5 filed on February 22, 1999 |

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| | Yes | Michael D. Dryden | Incentive Stock Options | 2,000 | Form 5 filed on February 22, 1999 |
| | Yes | Ronald F. Escue | Incentive Stock Options | 2,000 | Form 5 filed on February 22, 1999 |
| | Yes | V. Bond Evans | Non-Qualified Stock Options | 2,000 | Form 5 filed on February 22, 1999 |
| | Yes | Emil J. Fanelli | Incentive Stock Options | 1,000 | Form 5 filed on February 23, 2000 |
| | Yes | James M. Ferguson | Incentive Stock Options | 5,000 | Form 5 filed on February 22, 1999 |
| | Yes | William B. Kelley | Incentive Stock Options[16] | 5,000 | Form 3 filed on February 22, 1999 |
| | Yes | Daniel L. Levine | Incentive Stock Options | 3,000 | Form 5 filed on February 22, 1999 |
| | Yes | Frank Monteleone | Incentive Stock Options | 5,000 | Form 5 filed on February 22, 1999 |
| | Yes | Robert J. Ornstein | Incentive Stock Options | 5,000 | Form 5 filed on February 22, 1999 |

[16] Disclosed as Incentive Stock Options in Form 5 filed on February 23, 2000.

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
|  | Yes | Michael J. O'Rourke | Incentive Stock Options | 5,000 | Form 5 filed on February 22, 1999 |
|  | Yes | Jack H. Parkinson | Non-Qualified Stock Options | 2,000 | Form 5 filed on February 22, 1999 |
|  | Yes | Delbert J. Schmitz | Incentive Stock Options | 2,000 | Form 5 filed on February 22, 1999 |
| 12/11/1998<br><br>Options granted at $25.56 | No | Louis L. Borick | Incentive Stock Options[17] | 15,648 | Form 4 filed on February 12, 1999 |
|  | No | Louis L. Borick | Non-Qualified Stock Options[18] | 234,352 | Form 4 filed on February 12, 1999 |
| 3/19/1999<br><br>Options granted at $23.81 | No | Steven J. Borick | Incentive Stock Options | 16,976 | Form 4 filed on January 10, 2000 |
|  | No | Steven J. Borick | Non-Qualified Stock Options | 8,204 | Form 4 filed on January 10, 2000 |

---

[17] Disclosed as Incentive Stock Options in Form 4 filed on January 10, 2000.

[18] Disclosed as Non-Qualified Stock Options in Form 4 filed on January 10, 2000.

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| 9/24/1999<br><br>Options granted at $25.88 | Yes | Sheldon I. Ausman | Non-Qualified Stock Options | 2,000 | Form 5 filed on February 23, 2000 |
| | Yes | Steven J. Borick | Incentive Stock Options | 10,000 | Form 4 filed on January 10, 2000 |
| | Yes | Robert H. Bouskill | Incentive Stock Options | 5,000 | Form 3 filed on November 8, 2000 |
| | Yes | Raymond C. Brown | Non-Qualified Stock Options | 2,000 | Form 5 filed on February 23, 2000 |
| | Yes | Philip W. Colburn | Non-Qualified Stock Options | 2,000 | Form 4 filed on February 13, 2001 |
| | Yes | Michael D. Dryden | Incentive Stock Options | 2,500 | Form 5 filed on February 23, 2000 |
| | Yes | Michael D. Dryden | Non-Qualified Stock Options | 2,000 | Form 5 filed on February 23, 2000 |
| | Yes | V. Bond Evans | Non-Qualified Stock Options | 2,000 | Form 5 filed on February 23, 2000 |

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| | Yes | Emil J. Fanelli | Non-Qualified Stock Options[19] | 2,000 | Form 5 filed on February 23, 2000 |
| | Yes | James M. Ferguson | Incentive Stock Options | 5,000 | Form 5 filed on February 23, 2000 |
| | Yes | Parveen Kakar | Incentive Stock Options | 2,000 | Form 3 filed on February 13, 2004 |
| | Yes | William B. Kelley | Incentive Stock Options | 5,000 | Form 5 filed on February 23, 2000 |
| | Yes | Daniel L. Levine | Incentive Stock Options | 5,000 | Form 4 filed on January 10, 2000 |
| | Yes | Frank Monteleone | Incentive Stock Options | 5,000 | Form 5 filed on February 23, 2000 |
| | Yes | Robert J. Ornstein | Incentive Stock Options | 5,000 | Form 5 filed on February 23, 2000 |
| | Yes | Michael J. O'Rourke | Incentive Stock Options | 5,000 | Form 5 filed on February 23, 2000 |
| | Yes | Jack H. Parkinson | Non-Qualified Stock Options | 2,000 | Form 5 filed on February 23, 2000 |

[19] Defendant Fanelli's Form 4 filed on March 12, 2001 indicates he received 5,000 incentive stock options on the purported grant date of September 24, 1999.

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| 4/14/2000<br><br>Options granted at $30.38 | No | Robert H. Bouskill | Incentive Stock Options | 3,000 | Form 3 filed on November 8, 2000 |
| 9/20/2000<br><br>Options granted at $28.00 | Yes | Sheldon I. Ausman | Non-Qualified Stock Options | 2,000 | Form 5 filed on March 20, 2001 |
| | Yes | Steven J. Borick | Non-Qualified Stock Options | 56,429 | Form 4 filed on January 12, 2001 |
| | Yes | Steven J. Borick | Incentive Stock Options | 3,751 | Form 4 filed on January 12, 2001 |
| | Yes | Robert H. Bouskill | Incentive Stock Options | 1,943 | Form 5 filed on March 20, 2001 |
| | Yes | Robert H. Bouskill | Non-Qualified Stock Options | 57 | Form 5 filed on March 20, 2001 |
| | Yes | Raymond C. Brown | Non-Qualified Stock Options | 2,000 | Form 4 filed on January 12, 2001 |
| | Yes | Philip W. Colburn | Non-Qualified Stock Options | 2,000 | Form 4 filed on March 12, 2001 |

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| | Yes | Michael D. Dryden | Incentive Stock Options | 3,000 | Form 5 filed on March 20, 2001 |
| | Yes | V. Bond Evans | Non-Qualified Stock Options | 2,000 | Form 5 filed on March 20, 2001 |
| | Yes | Emil J. Fanelli | Incentive Stock Options | 3,000 | Form 4 filed on March 12, 2001 |
| | Yes | James M. Ferguson | Incentive Stock Options | 6,133 | Form 4 filed on January 12, 2001 |
| | Yes | James M. Ferguson | Non-Qualified Stock Options | 1,367 | Form 4 filed on January 12, 2001 |
| | Yes | Parveen Kakar | Incentive Stock Options | 4,000 | Form 3 filed on February 13, 2004 |
| | Yes | William B. Kelley | Incentive Stock Options | 4,638 | Form 5 filed on March 20, 2001 |
| | Yes | William B. Kelley | Non-Qualified Stock Options | 362 | Form 5 filed on February 4, 2002 |
| | Yes | Daniel L. Levine | Incentive Stock Options | 5,000 | Form 4 filed on March 12, 2001 |
| | Yes | Frank Monteleone | Incentive Stock Options | 4,638 | Form 5 filed on March 20, 2001 |

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| | Yes | Frank Monteleone | Non-Qualified Stock Options | 362 | Form 5 filed on March 20, 2001 |
| | Yes | Robert J. Ornstein | Incentive Stock Options | 5,000 | Form 4 filed on March 12, 2001 |
| | Yes | Michael J. O'Rourke | Incentive Stock Options | 6,133 | Form 5 filed on March 20, 2001 |
| | Yes | Michael J. O'Rourke | Non-Qualified Stock Options | 1,367 | Form 5 filed on March 20, 2001 |
| | Yes | Jack H. Parkinson | Non-Qualified Stock Options | 2,000 | Form 5 filed on March 20, 2001 |
| 5/14/2001<br><br>Options granted at $38.75 | No | Emil J. Fanelli | Incentive Stock Options | 4,773 | Form 5 filed on February 4, 2002 |
| | No | Emil J. Fanelli | Non-Qualified Stock Options | 227 | Form 5 filed on February 4, 2002 |
| 9/20/2001<br><br>Options granted at $29.40 | Yes | Sheldon I. Ausman | Incentive Stock Options | 1,000 | Form 5 filed on February 4, 2002 |

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| | Yes | Louis L. Borick | Incentive Stock Options | 10,203 | Form 5 filed on February 4, 2002 |
| | Yes | Louis L. Borick | Non-Qualified Stock Options | 189,797 | Form 5 filed on February 4, 2002 |
| | Yes | Steven J. Borick | Incentive Stock Options | 3,401 | Form 5 filed on February 4, 2002 |
| | Yes | Steven J. Borick | Non-Qualified Stock Options | 56,599 | Form 5 filed on February 4, 2002 |
| | Yes | Robert H. Bouskill | Incentive Stock Options | 4,072 | Form 5 filed on February 4, 2002 |
| | Yes | Robert H. Bouskill | Non-Qualified Stock Options | 928 | Form 5 filed on February 4, 2002 |
| | Yes | Raymond C. Brown | Incentive Stock Options | 1,000 | Form 5 filed on February 4, 2002 |
| | Yes | Philip W. Colburn | Incentive Stock Options | 1,000 | Form 5 filed on February 4, 2002 |
| | Yes | Michael D. Dryden | Incentive Stock Options | 3,000 | Form 5 filed on February 4, 2002 |
| | Yes | V. Bond Evans | Incentive Stock Options | 1,000 | Form 5 filed on February 4, 2002 |

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| | Yes | James M. Ferguson | Incentive Stock Options | 4,630 | Form 5 filed on February 4, 2002 |
| | Yes | James M. Ferguson | Non-Qualified Stock Options | 5,370 | Form 5 filed on February 4, 2002 |
| | Yes | William B. Kelley | Incentive Stock Options | 3,843 | Form 5 filed on February 4, 2002 |
| | Yes | William B. Kelley | Non-Qualified Stock Options | 1,157 | Form 5 filed on February 4, 2002 |
| | Yes | Daniel L. Levine | Incentive Stock Options | 4,194 | Form 5 filed on February 4, 2002 |
| | Yes | Daniel L. Levine | Non-Qualified Stock Options | 806 | Form 5 filed on February 4, 2002 |
| | Yes | Frank Monteleone | Incentive Stock Options | 3,843 | Form 4 filed on April 10, 2002 |
| | Yes | Frank Monteleone | Non-Qualified Stock Options | 1,157 | Form 4 filed on April 10, 2002 |
| | Yes | Robert J. Ornstein | Incentive Stock Options | 3,843 | Form 5 filed on February 4, 2002 |
| | Yes | Robert J. Ornstein | Non-Qualified Stock Options | 1,157 | Form 5 filed on February 4, 2002 |

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| 10/9/2002 Options granted at $36.20 | Yes | Michael J. O'Rourke | Incentive Stock Options | 4,630 | Form 5 filed on February 4, 2002 |
| | Yes | Michael J. O'Rourke | Non-Qualified Stock Options | 5,370 | Form 5 filed on February 4, 2002 |
| | Yes | Jack H. Parkinson | Incentive Stock Options | 1,000 | Form 5 filed on February 4, 2002 |
| | Yes | Sheldon I. Ausman | Non-Qualified Stock Options | 1,000 | Form 5 filed on October 22, 2002 |
| | Yes | Steven J. Borick | Incentive Stock Options | 2,762 | Form 5 filed on October 22, 2002 |
| | Yes | Steven J. Borick | Non-Qualified Stock Options | 47,238 | Form 5 filed on October 22, 2002 |
| | Yes | Robert H. Bouskill | Incentive Stock Options | 3,231 | Form 5 filed on October 30, 2002 |
| | Yes | Robert H. Bouskill | Non-Qualified Stock Options | 1,769 | Form 5 filed on October 30, 2002 |
| | Yes | Raymond C. Brown | Non-Qualified Stock Options | 1,000 | Form 5 filed on October 22, 2002 |

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| | Yes | Philip W. Colburn | Non-Qualified Stock Options | 1,000 | Form 5 filed on October 22, 2002 |
| | Yes | Michael D. Dryden | Incentive Stock Options | 4,429 | Form 5 filed on October 22, 2002 |
| | Yes | Michael D. Dryden | Non-Qualified Stock Options | 571 | Form 5 filed on October 22, 2002 |
| | Yes | V. Bond Evans | Non-Qualified Stock Options | 1,000 | Form 5 filed on October 22, 2002 |
| | Yes | Emil J. Fanelli | Incentive Stock Options | 3,344 | Form 5 filed on October 22, 2002 |
| | Yes | Emil J. Fanelli | Non-Qualified Stock Options | 1,656 | Form 5 filed on October 22, 2002 |
| | Yes | James M. Ferguson | Incentive Stock Options | 3,232 | Form 5 filed on October 22, 2002 |
| | Yes | James M. Ferguson | Non-Qualified Stock Options | 6,768 | Form 5 filed on October 22, 2002 |
| | Yes | Parveen Kakar | Incentive Stock Options | 6,000 | Form 3 filed on February 13, 2004 |
| | Yes | William B. Kelley | Incentive Stock Options | 3,280 | Form 5 filed on October 22, 2002 |

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| PURPORTED GRANT | PLAINTIFFS ALLEGE GRANT IS BACKDATED | NAME | TITLE OF DERIVATIVE (IF STATED) | NUMBER OF SHARES | DATE AND METHOD GRANT TO INDIVIDUAL FIRST PUBLICLY DISCLOSED |
|---|---|---|---|---|---|
| | Yes | William B. Kelley | Non-Qualified Stock Options | 1,720 | Form 5 filed on October 22, 2002 |
| | Yes | Daniel L. Levine | Incentive Stock Options | 3,280 | Form 5 filed on October 22, 2002 |
| | Yes | Daniel L. Levine | Non-Qualified Stock Options | 1,720 | Form 5 filed on October 22, 2002 |
| | Yes | Frank Monteleone | Incentive Stock Options | 3,280 | Form 5 filed on October 22, 2002 |
| | Yes | Frank Monteleone | Non-Qualified Stock Options | 1,720 | Form 5 filed on October 22, 2002 |
| | Yes | Robert J. Ornstein | Incentive Stock Options | 3,280 | Form 5 filed on October 22, 2002 |
| | Yes | Robert J. Ornstein | Non-Qualified Stock Options | 1,720 | Form 5 filed on October 22, 2002 |
| | Yes | Michael J. O'Rourke | Incentive Stock Options | 3,232 | Form 5 filed on October 22, 2002 |
| | Yes | Michael J. O'Rourke | Non-Qualified Stock Options | 6,768 | Form 5 filed on October 22, 2002 |
| | Yes | Jack H. Parkinson | Incentive Stock Options | 1,000 | Form 5 filed on October 22, 2002 |

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

## Backdating of Stock Option Grants at Superior

66. Like the stock option grants examined by *The Wall Street Journal*, the pattern of option grants identified herein is more than randomly fortuitous, and the true reason for the extraordinary pattern is that the stock options were improperly backdated.

67. Indeed, UBS Securities LLC ("UBS") published a report on June 13, 2006 which analyzed option grants for the companies in the Russell 2000 from 1998 through 2002 (the "UBS Report"). Based upon the results of the analysis, the UBS Report "scored" each company's option grants using a system that "attempt[ed] to identify suspicious stock performance around the grant dates." Of the 2,000 companies analyzed, Superior ranked as the *tenth* most likely to have backdated stock options, with a score of 250, indicating extremely suspicious grant activity and a high risk for regulatory inquiry into stock option granting practices. The average score for companies in the Russell 2000 was 47. Among the top 200 companies having more than three option grants from 1998 through 2002, Superior ranked *fourth*.

68. During the time that Defendants granted and received backdated stock options, the stock option plan in effect at Superior was the 1993 Stock Option Plan (the "1993 Plan").

## The 1993 Plan

69. According to the Company's proxy statements, the purpose of the 1993 Plan was to strengthen the Company by providing additional means of retaining and attracting competent management personnel and by providing to participating directors, officers and key employees who render valuable services to the Company added incentive for high levels of performance. Options granted under the 1993 Plan may be either "incentive stock options" or non-statutory stock options.

70. According to the Company's proxy statements, the 1993 Plan was administered by a Stock Option Committee appointed by the Board.

71. According to the Company's proxy statements, the exercise price for stock options granted under the 1993 Plan was to be *not less than 100% of the fair market*

*value of the Company's common stock on the date the option was granted*, which was to be the date on which the Stock Option Committee awarded the option. The 1993 Plan further defined "fair market value" as the "closing price of the Company's common stock on a national securities exchange."

72. From 1993 to 2002, the Stock Option Committee, which, according to the Company's proxy statements, "administer[ed] the Company's stock option plans," with the knowledge and approval of the other Director Defendants, knowingly and deliberately violated the terms of the 1993 Plan, APB 25 and Section 162(m) by backdating grants of stock options to make it appear as though the grants were made on dates when the market price of Superior's stock was lower than the market price on the actual grant dates, thereby unduly benefiting the recipients of the backdated options.

## Superior's Option Grant Practices Defied the Odds

73. Based on the Company's publicly disclosed documents, including Form 3s, Form 4s, Form 5s and proxy statements, stock options were granted to Company officers and directors on 24 dates between 1993 and 2002. Of these 24 dates, Plaintiffs identify options granted on *nine dates*, or 37.5%, as being backdated. Each of these nine grant dates coincides with a particularly low price:

a. January 4, 1993 was (1) the lowest closing price of the month of January 1993; (2) the lowest price of the fiscal quarter ended March 31, 1993; and (3) *the lowest closing price for Superior common stock for the entire Fiscal Year 1993*;

b. May 31, 1994 was (1) the second lowest closing price of the Company's stock for the month of May 1994; and (2) the third lowest closing price of the Company's stock for the quarter ended June 30, 1994;

c. February 1, 1995 was (1) the second lowest closing price of the Company's stock for the month of February 1995; (2) the third lowest closing price of the Company's stock for the quarter ended March 31, 1995; and (3) *the third lowest closing price for Superior common stock for the entire Fiscal Year 1995*;

d. April 14, 1997 was (1) the lowest closing price of the Company's stock

for the month of April 1997; (2) the lowest closing price of the Company's stock for the quarter ended June 30, 1997; and (3) *the second lowest closing price for Superior common stock for the entire Fiscal Year 1997*;

        e.     September 3, 1998 was (1) the second lowest closing price of the Company's common stock for the month of September 1998; (2) the second lowest closing price of the Company's common stock for the quarter ended September 30, 1998; and (3) *the second lowest closing price of Superior's common stock for the entire Fiscal Year 1998*;

        f.     September 24, 1999 was (1) the lowest closing price for the Company's common stock for the month of September 1999; and (2) *the lowest closing price for Superior common stock for the entire quarter ended September 30, 1999*;

        g.     September 20, 2000 was (1) the lowest closing price of the Company's common stock for the month of September 2000; and (2) preceded a substantial rise in the price of the Company's common stock, which did not fall below the exercise price for the remainder of the Relevant Period;

        h.     September 20, 2001 was (1) the lowest closing price of the Company's common stock for the month of September 2001; (2) the lowest closing price of the Company's common stock for the quarter ended September 30, 2001; and (3) *the lowest closing price of Superior common stock for the entire Fiscal Year 2001*; and

        i.     October 9, 2002 was (1) the lowest closing price of the Company's common stock for the month of October 2002; (2) the lowest closing price of the Company's common stock for the quarter ended December 31, 2002; and (3) *the lowest closing price of Superior common stock for the entire Fiscal Year 2002.*

    74.    In the *Zoran* derivative action, Judge Alsup of the United States District Court for the Northern District of California concluded that a "striking pattern" evidencing backdating had been established when the plaintiff pled that a favorable date had been obtained 7 times out of 32 grant dates, or 21.9%. *See In re Zoran Corporation Derivative Litig.*, 511 F. Supp. 2d 986, 1004 (N.D. Cal. 2007) (seven of thirty-two grants made at

opportune lows in a company's stock price constitutes a "striking pattern" of backdating). *See also In Re CNET Networks, Inc. Deriv. Litig.*, 483 F. Supp. 2d 947, 960 (N.D. Cal. 2007) ("Plaintiffs have successfully pleaded that grant[s] [were] backdated. It was not selected as part of an overall plan, and the sharp increase in stock price afterward is sufficient to eliminate the possibility that the grant date was the product of blind luck."); *Belova v. Sharp*, No. CV 07-299-MO, 2008 U.S. Dist. LEXIS 19880, at *13 (D. Or. Mar. 13, 2008) ("*TriQuint*") ("The shareholders do not need to allege that every grant has been backdated; they may select eight grants and allege that only those eight have been backdated.").

75.     In *Zoran*, Judge Alsup also noted that the likely probability of picking the monthly low for the grant of a stock option was 1 in 20, assuming 20 trading days in a month. *Zoran*, 511 F. Supp. 2d at 1004. Thus, for every 20 grant dates, one could reasonably anticipate that, on average, one would fall on a monthly low. Of the 32 grant dates pled by the *Zoran* plaintiff, Judge Alsup noted that, on average, one would expect two dates to fall on a monthly low. *Id.* Judge Alsup concluded that the plaintiff had established a "striking pattern" of backdating, as seven of the 32 grants fell on the monthly low price of the company's stock, the odds of which were one in 1,151, three other grants fell on the second lowest price of the month, and the odds of such a pattern occurring were one in 1,235. *Id.* The court agreed that such a pattern seemed "hugely suspicious." *Id.*

76.     Compared to *Zoran*, a substantially more suspicious pattern occurred at Superior. Applying the *Zoran* court's analysis, assuming 20 trading days in a month, of the 22 grant dates during the Relevant Period, one would expect one grant to fall on a monthly low,[20] none to fall on a quarterly low,[21] and none to fall on a yearly low.[22] However, at Superior:

a.     *Six* of the 22 grants (the grants dated January 4, 1993, April 14, 1997,

----

[20] $22/20 = 1.1$

[21] $22/60 = 0.37$

[22] $22/240 = 0.09$

September 24, 1999, September 20, 2000, September 20, 2001 and October 9, 2002) fell on a ***monthly low***, and ***three*** grants (the grants dated May 31, 1994, February 1, 1995, and September 3, 1998) fell on the ***second-lowest price of the month***;

      b.    ***Five*** of the 22 grants (the grants dated January 4, 1993, April 14, 1997, September 24, 1999, September 20, 2001, and October 9, 2002) fell on a ***quarterly low***, ***one*** grant (the grant dated September 3, 1998) fell on the ***second-lowest price of the quarter***, and ***two*** grants (the grants dated May 31, 1994 and February 1, 1995) fell on the ***third-lowest price of the quarter***; and

      c.    ***Three*** of the 22 grants (the grants dated January 4, 1993, September 20, 2001, and October 9, 2002) fell on a ***yearly low***, ***two*** grants (the grants dated April 14, 1997 and September 3, 1998) fell on the ***second-lowest price of the year***, and ***one*** grant (the grant dated February 1, 1995) fell on the ***third-lowest price of the year***.

77.    The odds of the foregoing pattern occurring are just ***one in 55,401,662***,[23] ***44,860 times*** as unlikely as the "hugely suspicious" pattern in ***Zoran***.

### The Merrill Lynch Analysis

78.    Merrill Lynch & Co., Inc. ("Merrill Lynch") published an analysis of option grants made at various companies in a report dated May 22, 2006 as further evidence that the returns enjoyed by options grantees at many companies were not by mere chance. The report analyzes the twenty day performance of each option grant reported in a company's proxy statements during the relevant backdating period. The analysis also calculates the annualized return of the option grants at twenty days after the grant and compares that annualized return with the company's overall annual return.

79.    Plaintiffs have applied the Merrill Lynch analysis for ***all 24*** publicly disclosed grants made during the Relevant Period. Courts, including Delaware and California courts, have consistently viewed the Merrill Lynch methodology favorably and accepted such an analysis as evidence of stock option backdating. *See, e.g., Zoran,* 511 F. Supp. 2d

---

[23] Odds calculated using Microsoft Excel's binomial distribution probability function.

at 1004 (denying a motion to dismiss based, in part, on the likelihood of options backdating as demonstrated by a statistical analysis, as was done in *Ryan*); *Edmonds*, 524 F. Supp. 2d at 1271 (court denied defendants' motion to dismiss for failure to make a demand and noted that the plaintiff had sufficiently alleged facts supporting an inference of backdating, which included a 20-day Merrill Lynch analysis); *Ryan v. Gifford*, 918 A.2d 341, 354-55 (Del. Ch. 2007) (accepting Merrill Lynch's analysis of stock options granted by a public company as indicative of backdating at the pleading stage); *Conrad v. Blank*, 940 A.2d 28, 40, n. 30 (Del. Ch. 2007) ("Here, [plaintiff] has done the same analysis [performed by Merrill Lynch].... It is sufficient that the plaintiff presented this court with the same statistical methods and similar aberrant option returns as those alleged in Ryan").

80.    An application of the Merrill Lynch analysis for the 24 publicly disclosed grants made during the Relevant Period further indicates that the grants alleged herein were backdated, as the vast discrepancies between the annualized management and annualized investors returns can only be explained by a practice of backdating. For the 24 publicly disclosed grants made during the Relevant Period, the average annualized return to management is 148%, as compared to 14% average annualized return to investors – *a difference of 133%*.

### The Director Defendants' Knowledge of the Backdating at Superior

81.    The Director Defendants who were not on the Stock Option Committee had actual knowledge of the backdating and knew that it violated the terms of the 1993 Plan, as they knew that the dates on which they were meeting did not correspond to the dates on which grants were purportedly being made. In addition, these Board members also knew that the use of backdated option grants violated ABP 25 and Section 162(m). All of the Director Defendants knew that the public statements that the Company followed APB 25 and granted options with exercise prices equal to the fair market value of Superior stock on the date of grant were false because the grants were not made as required on the dates that the members of the Stock Option Committee met and were, in fact, backdated. Each Director Defendant knowingly and deliberately granted and approved the backdated stock

options with knowledge of the consequences, *e.g.*, the effects on Superior's financial statements.

82.     Between 1994 and 2003, the Director Defendants repeated in proxy statements that the stock option grants made during that period carried an exercise price that was equal to "market value (closing price on the New York Stock Exchange – Composite Transactions of the Company's common stock) on the date of grant." However, the Director Defendants concealed until 2007 that the stock option grants were repeatedly and consciously backdated to ensure that the strike price associated with the option grants was below fair market value.

83.     Even more egregious, the Director Defendants, in bad faith, sought shareholder approval of amendments to the 1993 Plan in order to increase the number of shares available to backdate.  For example, in the Proxy Statements dated March 30, 1999 and April 5, 2001, the Director Defendants requested approval for an amendment to the 1993 Plan to increase the shares available for grant from 500,000 to 1,000,000 and from 1,000,000 to 1,500,000, respectively.

### 1993 Option Grants

84.     During Fiscal Year 1993, the shareholder-approved stock option plan in effect was the 1993 Plan.   During Fiscal Year 1993, the members of the Stock Option Committee, including Defendants Ausman and S. Borick, administered the 1993 Plan, including making all grants of stock options under the 1993 Plan.   Accordingly, Defendants Ausman and S. Borick controlled the timing and pricing of all stock option grants made during Fiscal Year 1993 under the 1993 Plan.

85.     The 1993 Plan required that the exercise price of all stock options be ***not less than 100% of the fair market value of the Company's common stock on the date the option was granted***, which was to be the date on which the Stock Option Committee awarded the option.  The 1993 Plan further defined "fair market value" as the "closing price of the Company's common stock on a national securities exchange."

86.     During Fiscal Year 1993, Defendants Ausman and S. Borick, as members of

the Stock Option Committee, purportedly granted options to Defendants Brown, Kazmi, Ornstein, Ferguson, Schmitz, Monteleone, O'Rourke, Levine and Dryden on January 4, 1993 at an exercise price of $19.08:

### First Quarter of Fiscal Year 1993



### Fiscal Year 1993



VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| Purported Grant Date | Name | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options[24] |
|---|---|---|---|---|---|
| 01/04/93 | Brown | $19.08 | 37,500 | $19.08 | 37,500 |
| | Kazmi | $19.08 | 15,000 | $19.08 | 15,000 |
| | Ornstein | $19.08 | 11,250 | $19.08 | 11,250 |
| | Ferguson | $19.08 | 7,500 | $19.08 | 7,500 |
| | Schmitz | $19.08 | At least 2,250 | $19.08 | At least 2,250 |
| | Monteleone | $19.08 | At least 1,500 | $19.08 | At least 1,500 |
| | O'Rourke | $19.08 | At least 1,500 | $19.08 | At least 1,500 |
| | Levine | $19.08 | At least 375 | $19.08 | At least 375 |
| | Dryden | $19.08 | At least 750 | $19.08 | At least 750 |

87.     The exercise price of $19.08 fell on: (1) the lowest closing price of the month of January 1993; (2) the lowest price of the fiscal quarter ended March 31, 1993; and (3) *the lowest closing price for Superior common stock for the entire Fiscal Year 1993*.

88.     Applying the Merrill Lynch analysis for this option grant, the average twenty day return is 15%, or 264% annualized, as compared to 128% annualized return to investors in 1993 – a difference of 136%.

89.     Defendants Ausman and S. Borick, as members of the Stock Option Committee, had the sole authority to choose the date and, in fact, did choose the date on which the purported January 4, 1993 grant was granted.  Ausman and S. Borick made this grant on a date after January 4, 1993, the reported grant date, and knowingly used hindsight to pick the purported January 4, 1993 date.  Ausman and S. Borick knew that the 1993 Plan required them to use the fair market value of the Company's stock on the actual

---

[24] Where the total number of options is unknown, *i.e.*, where the phrase "at least" is utilized, the stock option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 or Form 5 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

date of grant and knew that backdating the option grant to January 4, 1993, a date with a lower price than the actual grant date, violated the 1993 Plan.

90.     The favorable grant date, results of the Merrill Lynch statistical analysis, and the Company's admission that, between 1991 and 2006, *"for most option grants, there were deficiencies in the process of granting, documenting or accounting for stock options, including in several instances retrospectively obtaining lower exercise prices and granting options to new employees at prices set before their actual hire dates"* support the allegation that the purported January 4, 1993 stock option grant was unlawfully backdated in violation of the 1993 Plan, federal law and California law.

### 1994 Option Grants

91.     During Fiscal Year 1994, the shareholder-approved stock option plan in effect was the 1993 Plan.   During Fiscal Year 1994, the members of the Stock Option Committee, including Defendants Ausman and S. Borick, administered the 1993 Plan, including making all grants of stock options under the 1993 Plan.   Accordingly, Defendants Ausman and S. Borick controlled the timing and pricing of all stock option grants made during Fiscal Year 1994 under the 1993 Plan.

92.     The 1993 Plan required that the exercise price of all stock options be *not less than 100% of the fair market value of the Company's common stock on the date the option was granted*, which was to be the date on which the Stock Option Committee awarded the option.  The 1993 Plan further defined "fair market value" as the "closing price of the Company's common stock on a national securities exchange."

93.     During Fiscal Year 1994, Defendants Ausman and S. Borick, as members of the Stock Option Committee, purportedly granted options to Defendants Brown, Ornstein, Kazmi, Ferguson, and Maldini on May 31, 1994 at an exercise price of $31.00:

//

//

//

//

### Second Quarter of Fiscal Year 1994



### Fiscal Year 1994



// 

//

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| Purported Grant Date | Name | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 05/31/94 | Brown | $31.00 | 15,000 | $31.00 | 15,000 |
| | Ornstein | $31.00 | 10,000 | $31.00 | 10,000 |
| | Kazmi | $31.00 | 10,000 | $31.00 | 10,000 |
| | Ferguson | $31.00 | 5,000 | $31.00 | 5,000 |
| | Maldini | $31.00 | 5,000 | $31.00 | 5,000 |

94.     The exercise price of $31.00 fell on: (1) the second lowest closing price of the Company's stock for the month of May 1994; and (2) the third lowest closing price of the Company's stock for the quarter ended June 30, 1994.

95.     Applying the Merrill Lynch analysis for this option grant, the average twenty day return is 4%, or 65% annualized, as compared to -39% annualized return to investors in 1994 – a difference of 104%.

96.     Defendants Ausman and S. Borick, as members of the Stock Option Committee, had the sole authority to choose the date and, in fact, did choose the date on which the purported May 31, 1994 grant was granted.  Ausman and S. Borick made this grant on a date after May 31, 1994, the reported grant date, and knowingly used hindsight to pick the purported May 31, 1994 date.  Ausman and S. Borick knew that the 1993 Plan required them to use the fair market value of the Company's stock on the actual date of grant and knew that backdating the option grant to May 31, 1994, a date with a lower price than the actual grant date, violated the 1993 Plan.

97.     The favorable grant date, results of the Merrill Lynch statistical analysis, and the Company's admission that, between 1991 and 2006, *"for most option grants, there were deficiencies in the process of granting, documenting or accounting for stock options, including in several instances retrospectively obtaining lower exercise prices and granting options to new employees at prices set before their actual hire dates"* support the allegation that the purported May 31, 1994 stock option grant was unlawfully

backdated in violation of the 1993 Plan, federal law and California law.

## 1995 Option Grants

98.     During Fiscal Year 1995, the shareholder-approved stock option plan in effect was the 1993 Plan. During Fiscal Year 1995, the members of the Stock Option Committee, including Defendants S. Borick and Evans, administered the 1993 Plan, including making all grants of stock options under the 1993 Plan. Accordingly, Defendants S. Borick and Evans controlled the timing and pricing of all stock option grants made during Fiscal Year 1995 under the 1993 Plan.

99.     The 1993 Plan required that the exercise price of all stock options be ***not less than 100% of the fair market value of the Company's common stock on the date the option was granted***, which was to be the date on which the Stock Option Committee awarded the option. The 1993 Plan further defined "fair market value" as the "closing price of the Company's common stock on a national securities exchange."

100.    During Fiscal Year 1995, Defendants S. Borick and Evans, as members of the Stock Option Committee, purportedly granted options to Defendants Brown, Ornstein, Ferguson, Maldini, Colburn, Parkinson, Escue, O'Rourke, Schmitz, Kelley, Monteleone, Levine and Dryden on February 1, 1995 at an exercise price of $24.50:

//
//
//
//
//
//
//
//
//
//
//

### First Quarter of Fiscal Year 1995



### Fiscal Year 1995



// 

//

| Purported Grant Date | Name | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 02/01/95 | Brown | $24.50 | 15,000 | $24.50 | 15,000 |
| | Ornstein | $24.50 | 10,000 | $24.50 | 10,000 |
| | Ferguson | $24.50 | 5,000 | $24.50 | 5,000 |
| | Maldini | $24.50 | 5,000 | $24.50 | 5,000 |
| | Colburn | $24.50 | 1,000 | $24.50 | At least 1,000 |
| | Parkinson | $24.50 | 1,000 | $24.50 | At least 1,000 |
| | Escue | $24.50 | At least 2,000 | $24.50 | At least 2,000 |
| | O'Rourke | $24.50 | At least 2,500 | $24.50 | At least 2,500 |
| | Schmitz | $24.50 | At least 2,000 | $24.50 | At least 2,000 |
| | Kelley | $24.50 | At least 2,000 | $24.50 | At least 2,000 |
| | Monteleone | $24.50 | At least 2,000 | $24.50 | At least 2,000 |
| | Levine | $24.50 | At least 1,000 | $24.50 | At least 1,000 |
| | Dryden | $24.50 | At least 1,000 | $24.50 | At least 1,000 |

101.    The exercise price of $24.50 fell on: (1) the second lowest closing price of the Company's stock for the month of February 1995; (2) the third lowest closing price of the Company's stock for the quarter ended March 31, 1995; and (3) *the third lowest closing price for Superior common stock for the entire Fiscal Year 1995*.

102.    Applying the Merrill Lynch analysis for this option grant, the average twenty day return is 12%, or 224% annualized, as compared to 0% annualized return to investors in 1995 – a difference of 224%.

103.    Defendants S. Borick and Evans, as members of the Stock Option Committee, had the sole authority to choose the date and, in fact, did choose the date on which the purported February 1, 1995 grant was granted. S. Borick and Evans made this grant on a date after February 1, 1995, the reported grant date, and knowingly used hindsight to pick the purported February 1, 1995 date. S. Borick and Evans knew that the 1993 Plan

required them to use the fair market value of the Company's stock on the actual date of grant and knew that backdating the option grant to February 1, 1995, a date with a lower price than the actual grant date, violated the 1993 Plan.

104.    The favorable grant date, results of the Merrill Lynch statistical analysis, and the Company's admission that, between 1991 and 2006, *"for most option grants, there were deficiencies in the process of granting, documenting or accounting for stock options, including in several instances retrospectively obtaining lower exercise prices and granting options to new employees at prices set before their actual hire dates"* support the allegation that the purported February 1, 1995 stock option grant was unlawfully backdated in violation of the 1993 Plan, federal law and California law.

### 1997 Option Grants

105.    During Fiscal Year 1997, the shareholder-approved stock option plan in effect was the 1993 Plan.   During Fiscal Year 1997, the members of the Stock Option Committee, including Defendants S. Borick and Evans, administered the 1993 Plan, including making all grants of stock options under the 1993 Plan.   Accordingly, Defendants S. Borick and Evans controlled the timing and pricing of all stock option grants made during Fiscal Year 1997 under the 1993 Plan.

106.    The 1993 Plan required that the exercise price of all stock options be *not less than 100% of the fair market value of the Company's common stock on the date the option was granted*, which was to be the date on which the Stock Option Committee awarded the option.   The 1993 Plan further defined "fair market value" as the "closing price of the Company's common stock on a national securities exchange."

107.    During Fiscal Year 1997, Defendants S. Borick and Evans, as members of the Stock Option Committee, purportedly granted options to Defendants Ornstein, Ferguson, Maldini, Kelley, O'Rourke, Monteleone, Bouskill, Dryden, and Levine on April 14, 1997 at an exercise price of $22.63:

//

//

### Second Quarter of Fiscal Year 1997



### Fiscal Year 1997



VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| Purported Grant Date | Name | Exercise Price[25] | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 04/14/97 | Ornstein | $22.63 | 5,000 | $22.63 | 5,000 |
| | Ferguson | $22.63 | 3,000 | $22.63 | 3,000 |
| | Maldini | $22.63 | 3,000 | $22.63 | 3,000 |
| | Kelley | $22.63 | At least 3,000 | $22.63 | At least 3,000 |
| | O'Rourke | $22.63 | At least 3,000 | $22.63 | At least 3,000 |
| | Monteleone | $22.63 | At least 3,000 | $22.63 | At least 3,000 |
| | Bouskill | $22.63 | At least 2,250 | $22.63 | At least 2,250 |
| | Dryden | $22.63 | At least 1,000 | $22.63 | At least 1,000 |
| | Levine | $22.63 | At least 1,000 | $22.63 | At least 1,000 |

108.    The exercise price of $22.63 fell on: (1) the lowest closing price of the Company's stock for the month of April 1997; (2) the lowest closing price of the Company's stock for the quarter ended June 30, 1997; and (3) *the second lowest closing price for Superior common stock for the entire Fiscal Year 1997*.

109.    Defendants S. Borick and Evans, as members of the Stock Option Committee, had the sole authority to choose the date and, in fact, did choose the date on which the purported April 14, 1997 grant was granted.  S. Borick and Evans made this grant on a date after April 14, 1997, the reported grant date, and knowingly used hindsight to pick the purported April 14, 1997 date.  S. Borick and Evans knew that the 1993 Plan required them to use the fair market value of the Company's stock on the actual date of grant and knew that backdating the option grant to February 1, 1995, a date with a lower price than the actual grant date, violated the 1993 Plan..

110.    The favorable grant date and the Company's admission that, between 1991

---

[25] Options granted to Ornstein, Ferguson and Maldini are incorrectly recorded in the Company's proxy as granted at an exercise price of $26.63.

and 2006, "*for most option grants, there were deficiencies in the process of granting, documenting or accounting for stock options, including in several instances retrospectively obtaining lower exercise prices and granting options to new employees at prices set before their actual hire dates*" support the allegation that the purported April 14, 1997 stock option grant was unlawfully backdated in violation of the 1993 Plan, federal law and California law.

## 1998 Option Grants

111.  During Fiscal Year 1998, the shareholder-approved stock option plan in effect was the 1993 Plan.  During Fiscal Year 1998, the members of the Stock Option Committee, including Defendants Ausman, Colburn and Evans, administered the 1993 Plan, including making all grants of stock options under the 1993 Plan.  Accordingly, Defendants Ausman, Colburn and Evans controlled the timing and pricing of all stock option grants made during Fiscal Year 1998 under the 1993 Plan.

112.  The 1993 Plan required that the exercise price of all stock options be *not less than 100% of the fair market value of the Company's common stock on the date the option was granted*, which was to be the date on which the Stock Option Committee awarded the option.  The 1993 Plan further defined "fair market value" as the "closing price of the Company's common stock on a national securities exchange."

113.  During Fiscal Year 1998, Defendants Ausman, Colburn, and Evans, as a member of the Stock Option Committee, purportedly granted options to Defendants Ornstein, Ferguson, O'Rourke, Monteleone, Kelley, Colburn, Parkinson, Ausman, Brown, Evans, S. Borick, Levine, Bouskill, Schmitz, Dryden, Escue and Fanelli on September 3, 1998 at an exercise price of $20.63:

//
//
//
//
//

### Third Quarter of Fiscal Year 1998



### Fiscal Year 1998



VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| Purported Grant Date | Name | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 09/03/98 | Ornstein | $20.63 | 5,000 | $20.63 | 5,000 |
| | Ferguson | $20.63 | 5,000 | $20.63 | 5,000 |
| | O'Rourke | $20.63 | 5,000 | $20.63 | 5,000 |
| | Monteleone | $20.63 | At least 5,000 | $20.63 | At least 5,000 |
| | Kelley | $20.63 | At least 5,000 | $20.63 | At least 5,000 |
| | Colburn | $20.63 | At least 2,000 | $20.63 | At least 2,000 |
| | Parkinson | $20.63 | At least 2,000 | $20.63 | At least 2,000 |
| | Ausman | $20.63 | At least 2,000 | $20.63 | At least 2,000 |
| | Brown | $20.63 | At least 2,000 | $20.63 | At least 2,000 |
| | Evans | $20.63 | At least 2,000 | $20.63 | At least 2,000 |
| | S. Borick | $20.63 | At least 2,000 | $20.63 | At least 2,000 |
| | Levine | $20.63 | At least 3,000 | $20.63 | At least 3,000 |
| | Bouskill | $20.63 | At least 3,000 | $20.63 | At least 3,000 |
| | Schmitz | $20.63 | At least 2,000 | $20.63 | At least 2,000 |
| | Dryden | $20.63 | At least 2,000 | $20.63 | At least 2,000 |
| | Escue | $20.63 | At least 2,000 | $20.63 | At least 2,000 |
| | Fanelli | $20.63 | At least 1,000 | $20.63 | At least 1,000 |

114.   The exercise price of $20.63 fell on: (1) the second lowest closing price of the Company's common stock for the month of September 1998; (2) the second lowest closing price of the Company's common stock for the quarter ended September 30, 1998; and (3) *the second lowest closing price of Superior's common stock for the entire Fiscal Year 1998*.

115.   Applying the Merrill Lynch analysis for this option grant, the average twenty day return is 7%, or 119% annualized, as compared to 4% annualized return to investors in 1998 – a difference of 116%.

116.   Defendants Ausman, Colburn, and Evans, as members of the Stock Option Committee, had the sole authority to choose the date and, in fact, did choose the date on which the purported September 3, 1998 grant was granted. Ausman, Colburn, and Evans made this grant on a date after September 3, 1998, the reported grant date, and knowingly used hindsight to pick the purported September 3, 1998 date. Ausman, Colburn, and Evans knew that the 1993 Plan required them to use the fair market value of the Company's stock on the actual date of grant and knew that backdating the option grant to September 3, 1998, a date with a lower price than the actual grant date, violated the 1993 Plan.

117.   The favorable grant date, results of the Merrill Lynch statistical analysis, and the Company's admission that, between 1991 and 2006, *"for most option grants, there were deficiencies in the process of granting, documenting or accounting for stock options, including in several instances retrospectively obtaining lower exercise prices and granting options to new employees at prices set before their actual hire dates"* support the allegation that the purported September 3, 1998 stock option grant was unlawfully backdated in violation of the 1993 Plan, federal law and California law.

### 1999 Option Grants

118.   During Fiscal Year 1999, the shareholder-approved stock option plan in effect was the 1993 Plan. During Fiscal Year 1999, the members of the Stock Option Committee, including Defendants Ausman, Colburn and Evans, administered the 1993 Plan, including making all grants of stock options under the 1993 Plan. Accordingly, Defendants Ausman, Colburn and Evans controlled the timing and pricing of all stock option grants made during Fiscal Year 1999 under the 1993 Plan.

119.   The 1993 Plan required that the exercise price of all stock options be ***not less than 100% of the fair market value of the Company's common stock on the date the option was granted***, which was to be the date on which the Stock Option Committee awarded the option. The 1993 Plan further defined "fair market value" as the "closing price of the Company's common stock on a national securities exchange."

120.  During Fiscal Year 1999, Defendants Ausman, Colburn, and Evans, as members of the Stock Option Committee, purportedly granted options to Defendants S. Borick, Ornstein, Ferguson, O'Rourke, Levine, Kelley, Monteleone, Fanelli, Bouskill, Parkinson, Ausman, Evans, Brown, Colburn, Kakar and Dryden on September 24, 1999 at an exercise price of $25.88:

### Third Quarter of Fiscal Year 1999



//
//
//
//
//
//
//
//
//
//

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

### Fiscal Year 1999



| Purported Grant Date | Name | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 09/24/99 | S. Borick | $25.88 | 10,000 | $25.88 | 10,000 |
| | Ornstein | $25.88 | 5,000 | $25.88 | 5,000 |
| | Ferguson | $25.88 | 5,000 | $25.88 | 5,000 |
| | O'Rourke | $25.88 | 5,000 | $25.88 | 5,000 |
| | Levine | $25.88 | At least 5,000 | $25.88 | At least 5,000 |
| | Kelley | $25.88 | At least 5,000 | $25.88 | At least 5,000 |
| | Monteleone | $25.88 | At least 5,000 | $25.88 | At least 5,000 |
| | Fanelli | $25.88 | At least 5,000 | $25.88 | At least 5,000 |
| | Bouskill | $25.88 | At least 5,000 | $25.88 | At least 5,000 |
| | Parkinson | $25.88 | At least 2,000 | $25.88 | At least 2,000 |
| | Ausman | $25.88 | At least 2,000 | $25.88 | At least 2,000 |
| | Evans | $25.88 | At least 2,000 | $25.88 | At least 2,000 |
| | Brown | $25.88 | At least 2,000 | $25.88 | At least 2,000 |

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| Colburn | $25.88 | At least 2,000 | $25.88 | At least 2,000 |
| Kakar | $25.88 | At least 2,000 | $25.88 | At least 2,000 |
| Dryden | $25.88 | At least 4,500 | $25.88 | At least 4,500 |

121. The exercise price of $25.88 fell on: (1) the lowest closing price for the Company's common stock for the month of September 1999; and (2) *the lowest closing price for Superior common stock for the entire quarter ended September 30, 1999*.

122. Applying the Merrill Lynch analysis for this option grant, the average twenty day return is 4%, or 76% annualized, as compared to -4% annualized return to investors in 1999 – a difference of 80%.

**123.** Defendants Ausman, Colburn, and Evans, as members of the Stock Option Committee, had the sole authority to choose the date and, in fact, did choose the date on which the purported September 24, 1999 grant was granted. Ausman, Colburn, and Evans made this grant on a date after September 24, 1999, the reported grant date, and knowingly used hindsight to pick the purported September 24, 1999 date. Ausman, Colburn, and Evans knew that the 1993 Plan required them to use the fair market value of the Company's stock on the actual date of grant and knew that backdating the option grant to September 24, 1999, a date with a lower price than the actual grant date, violated the 1993 Plan.

124. The favorable grant date, results of the Merrill Lynch statistical analysis, and the Company's admission that, between 1991 and 2006, *"for most option grants, there were deficiencies in the process of granting, documenting or accounting for stock options, including in several instances retrospectively obtaining lower exercise prices and granting options to new employees at prices set before their actual hire dates"* support the allegation that the purported September 24, 1999 stock option grant was unlawfully backdated in violation of the 1993 Plan, federal law and California law.

## 2000 Option Grants

125. During Fiscal Year 2000, the shareholder-approved stock option plan in effect

was the 1993 Plan.   During Fiscal Year 2000, the members of the Stock Option Committee, including Defendants Ausman, Colburn and Evans, administered the 1993 Plan, including making all grants of stock options under the 1993 Plan.   Accordingly, Defendants Ausman, Colburn and Evans controlled the timing and pricing of all stock option grants made during Fiscal Year 2000 under the 1993 Plan.

126.   The 1993 Plan required that the exercise price of all stock options be ***not less than 100% of the fair market value of the Company's common stock on the date the option was granted***, which was to be the date on which the Stock Option Committee awarded the option.   The 1993 Plan further defined "fair market value" as the "closing price of the Company's common stock on a national securities exchange."

127.   During Fiscal Year 2000, Defendants Ausman, Colburn, and Evans, as members of the Stock Option Committee, purportedly granted options to Defendants S. Borick, Ferguson, O'Rourke, Ornstein, Kelley, Monteleone, Levine, Kakar, Fanelli, Bouskill, Ausman, Brown, Parkinson, Colburn, Evans and Dryden on September 20, 2000 at an exercise price of $28.00:

### Third Quarter of Fiscal Year 2000



VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

### Fiscal Year 2000



| Purported Grant Date | Name | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 09/20/00 | S. Borick | $28.00 | 60,000 | $28.00 | 60,000 |
| | Ferguson | $28.00 | 7,500 | $28.00 | 7,500 |
| | O'Rourke | $28.00 | 7,500 | $28.00 | 7,500 |
| | Ornstein | $28.00 | 5,000 | $28.00 | 5,000 |
| | Kelley | $28.00 | At least 5,000 | $28.00 | At least 5,000 |
| | Monteleone | $28.00 | At least 5,000 | $28.00 | At least 5,000 |
| | Levine | $28.00 | At least 5,000 | $28.00 | At least 5,000 |
| | Kakar | $28.00 | At least 4,000 | $28.00 | At least 4,000 |
| | Fanelli | $28.00 | At least 3,000 | $28.00 | At least 3,000 |
| | Bouskill | $28.00 | At least 2,000 | $28.00 | At least 2,000 |
| | Ausman | $28.00 | At least 2,000 | $28.00 | At least 2,000 |
| | Brown | $28.00 | At least 2,000 | $28.00 | At least 2,000 |

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| Parkinson | $28.00 | At least 2,000 | $28.00 | At least 2,000 |
| Colburn | $28.00 | At least 2,000 | $28.00 | At least 2,000 |
| Evans | $28.00 | At least 2,000 | $28.00 | At least 2,000 |
| Dryden | $28.00 | At least 3,000 | $28.00 | At least 3,000 |

128. The exercise price of $28.00 fell on: (1) the lowest closing price of the Company's common stock for the month of September 2000; and (2) preceded a substantial rise in the price of the Company's common stock, which did not fall below the exercise price for the remainder of the Relevant Period.

129. Applying the Merrill Lynch analysis for this option grant, the average twenty day return is 8%, or 143% annualized, as compared to 18% annualized return to investors in 2000 – a difference of 125%.

130. Defendants Ausman, Colburn, and Evans, as members of the Stock Option Committee, had the sole authority to choose the date and, in fact, did choose the date on which the purported September 20, 2000 grant was granted. Ausman, Colburn, and Evans made this grant on a date after September 20, 2000, the reported grant date, and knowingly used hindsight to pick the purported September 20, 2000 date. Ausman, Colburn, and Evans knew that the 1993 Plan required them to use the fair market value of the Company's stock on the actual date of grant and knew that backdating the option grant to September 20, 2000, a date with a lower price than the actual grant date, violated the 1993 Plan.

131. The favorable grant date, results of the Merrill Lynch statistical analysis, and the Company's admission that, between 1991 and 2006, *"for most option grants, there were deficiencies in the process of granting, documenting or accounting for stock options, including in several instances retrospectively obtaining lower exercise prices and granting options to new employees at prices set before their actual hire dates"* support the allegation that the purported September 20, 2000 stock option grant was unlawfully backdated in violation of the 1993 Plan, federal law and California law.

### 2001 Option Grants

132.   During Fiscal Year 2001, the shareholder-approved stock option plan in effect was the 1993 Plan.   During Fiscal Year 2001, the members of the Stock Option Committee, including Defendants Ausman, Colburn and Evans, administered the 1993 Plan, including making all grants of stock options under the 1993 Plan.   Accordingly, Defendants Ausman, Colburn and Evans controlled the timing and pricing of all stock option grants made during Fiscal Year 2001 under the 1993 Plan.

133.   The 1993 Plan required that the exercise price of all stock options be *not less than 100% of the fair market value of the Company's common stock on the date the option was granted*, which was to be the date on which the Stock Option Committee awarded the option.   The 1993 Plan further defined "fair market value" as the "closing price of the Company's common stock on a national securities exchange."

134.   During Fiscal Year 2001, Defendants Ausman, Colburn, and Evans, as members of the Stock Option Committee, purportedly granted options to Defendants L. Borick, S. Borick, Ferguson, O'Rourke, Ornstein, Kelley, Bouskill, Monteleone, Levine, Colburn, Brown, Ausman, Parkinson, Dryden and Evans on September 20, 2001 at an exercise price of $29.40:

//

//

//

//

//

//

//

//

### Third Quarter of Fiscal Year 2001



### Fiscal Year 2001



//

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| Purported Grant Date | Name | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 09/20/01 | L. Borick | $29.40 | 200,000 | $29.40 | 200,000 |
| | S. Borick | $29.40 | 60,000 | $29.40 | 60,000 |
| | Ferguson | $29.40 | 10,000 | $29.40 | 10,000 |
| | O'Rourke | $29.40 | 10,000 | $29.40 | 10,000 |
| | Ornstein | $29.40 | 5,000 | $29.40 | 5,000 |
| | Kelley | $29.40 | At least 5,000 | $29.40 | At least 5,000 |
| | Bouskill | $29.40 | At least 5,000 | $29.40 | At least 5,000 |
| | Monteleone | $29.40 | At least 5,000 | $29.40 | At least 5,000 |
| | Levine | $29.40 | At least 5,000 | $29.40 | At least 5,000 |
| | Colburn | $29.40 | At least 1,000 | $29.40 | At least 1,000 |
| | Brown | $29.40 | At least 1,000 | $29.40 | At least 1,000 |
| | Ausman | $29.40 | At least 1,000 | $29.40 | At least 1,000 |
| | Parkinson | $29.40 | At least 1,000 | $29.40 | At least 1,000 |
| | Dryden | $29.40 | At least 3,000 | $29.40 | At least 3,000 |
| | Evans | $29.40 | At least 1,000 | $29.40 | At least 1,000 |

135.   The exercise price of $29.40 fell on: (1) the lowest closing price of the Company's common stock for the month of September 2001; (2) the lowest closing price of the Company's common stock for the quarter ended September 30, 2001; and (3) *the lowest closing price of Superior common stock for the entire Fiscal Year 2001*.

136.   Applying the Merrill Lynch analysis for this option grant, the average twenty day return is 7%, or 128% annualized, as compared to 28% annualized return to investors in 2001 – a difference of 101%.

137.   Defendants Ausman, Colburn, and Evans, as members of the Stock Option Committee, had the sole authority to choose the date and, in fact, did choose the date on which the purported September 20, 2001 grant was granted.  Ausman, Colburn, and Evans

made this grant on a date after September 20, 2001, the reported grant date, and knowingly used hindsight to pick the purported September 20, 2001 date. Ausman, Colburn, and Evans knew that the 1993 Plan required them to use the fair market value of the Company's stock on the actual date of grant and knew that backdating the option grant to September 20, 2001, a date with a lower price than the actual grant date, violated the 1993 Plan.

138. The favorable grant date, results of the Merrill Lynch statistical analysis, and the Company's admission that, between 1991 and 2006, *"for most option grants, there were deficiencies in the process of granting, documenting or accounting for stock options, including in several instances retrospectively obtaining lower exercise prices and granting options to new employees at prices set before their actual hire dates"* support the allegation that the purported September 20, 2001 stock option grant was unlawfully backdated in violation of the 1993 Plan, federal law and California law.

## 2002 Option Grants

139. During Fiscal Year 2002, the shareholder-approved stock option plan in effect was the 1993 Plan. During Fiscal Year 2002, the members of the Stock Option Committee, including Defendants Ausman, Colburn and Evans, administered the 1993 Plan, including making all grants of stock options under the 1993 Plan. Accordingly, Defendants Ausman, Colburn and Evans controlled the timing and pricing of all stock option grants made during Fiscal Year 2002 under the 1993 Plan.

140. The 1993 Plan required that the exercise price of all stock options be *not less than 100% of the fair market value of the Company's common stock on the date the option was granted*, which was to be the date on which the Stock Option Committee awarded the option. The 1993 Plan further defined "fair market value" as the "closing price of the Company's common stock on a national securities exchange."

141. During Fiscal Year 2002, Defendants Ausman, Colburn, and Evans, as members of the Stock Option Committee, purportedly granted options to Defendants S. Borick, Ferguson, O'Rourke, Kakar, Ornstein, Bouskill, Kelley, Levine, Monteleone,

Fanelli, Colburn, Parkinson, Brown, Evans, Ausman and Dryden on October 9, 2002 at an exercise price of $36.20:

### Fourth Quarter of Fiscal Year 2002



### Fiscal Year 2002



VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

| Purported Grant Date | Name | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 10/09/02 | S. Borick | $36.20 | 50,000 | $36.20 | 50,000 |
| | Ferguson | $36.20 | 10,000 | $36.20 | 10,000 |
| | O'Rourke | $36.20 | 10,000 | $36.20 | 10,000 |
| | Kakar | $36.20 | At least 6,000 | $36.20 | At least 6,000 |
| | Ornstein | $36.20 | 5,000 | $36.20 | 5,000 |
| | Bouskill | $36.20 | At least 5,000 | $36.20 | At least 5,000 |
| | Kelley | $36.20 | At least 5,000 | $36.20 | At least 5,000 |
| | Levine | $36.20 | At least 5,000 | $36.20 | At least 5,000 |
| | Monteleone | $36.20 | At least 5,000 | $36.20 | At least 5,000 |
| | Fanelli | $36.20 | At least 5,000 | $36.20 | At least 5,000 |
| | Colburn | $36.20 | At least 1,000 | $36.20 | At least 1,000 |
| | Parkinson | $36.20 | At least 1,000 | $36.20 | At least 1,000 |
| | Brown | $36.20 | At least 1,000 | $36.20 | At least 1,000 |
| | Evans | $36.20 | At least 1,000 | $36.20 | At least 1,000 |
| | Ausman | $36.20 | At least 1,000 | $36.20 | At least 1,000 |
| | Dryden | $36.20 | At least 5,000 | $36.20 | At least 5,000 |

142.   The exercise price of $36.20 fell on: (1) the lowest closing price of the Company's common stock for the month of October 2002; (2) the lowest closing price of the Company's common stock for the quarter ended December 31, 2002; and (3) *the lowest closing price of Superior common stock for the entire Fiscal Year 2002*.

143.   Applying the Merrill Lynch analysis for this option grant, the average twenty day return is 16%, or 284% annualized, as compared to 3% annualized return to investors in 2002 – a difference of 281%.

144.   Defendants Ausman, Colburn, and Evans, as members of the Stock Option Committee, had the sole authority to choose the date and, in fact, did choose the date on

VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

which the purported October 9, 2002 grant was granted.  Ausman, Colburn, and Evans made this grant on a date after October 9, 2002, the reported grant date, and knowingly used hindsight to pick the purported October 9, 2002 date.  Ausman, Colburn, and Evans knew that the 1993 Plan required them to use the fair market value of the Company's stock on the actual date of grant and knew that backdating the option grant to October 9, 2002, a date with a lower price than the actual grant date, violated the 1993 Plan.

145.   The favorable grant date, results of the Merrill Lynch statistical analysis, and the Company's admission that, between 1991 and 2006, *"for most option grants, there were deficiencies in the process of granting, documenting or accounting for stock options, including in several instances retrospectively obtaining lower exercise prices and granting options to new employees at prices set before their actual hire dates"* support the allegation that the October 9, 2002 stock option grant was unlawfully backdated in violation of the 1993 Plan, federal law and California law.

146.   The reason for the pattern set forth in the preceding paragraphs is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made.  Rather, the Stock Option Committee members, with the knowledge and approval of the other Director Defendants, knowingly and deliberately contravened the 1993 Plan by backdating the stock option grants to make it appear as though the grants were made on dates when the market price of Superior stock was lower than the market price on the actual grant dates, thereby unduly benefiting the recipients.  This improper backdating, which violated the terms of the 1993 Plan, resulted in option grants with lower exercise prices, which improperly increased the value of the options and improperly reduced the amounts the option recipients had to pay the Company upon exercise of the options.

147.   Prior to the enactment of the Sarbanes-Oxley Act of 2002 ("SOX"), the Defendants were able to engage in backdating of option grants with relative ease because under federal law they were only required to report option grants to the SEC once a year.

148.   Pursuant to SOX, executives and directors were required to report option

grants to the SEC within two days of the grant.  With this new two day reporting requirement in place, the pattern of backdating options seen previously from 1993 through 2002 came to an end, but remained hidden from the investing public through the continued false reporting of financial information in SEC filings by the Company as described below.

### Superior's Backdating Comes to Light

149.   Defendants' backdating at Superior first came to light on November 9, 2006, when Plaintiff Gary B. Eldred filed the first shareholder derivative complaint against Defendants on behalf of Superior after an investigation into Superior's past options granting practices.

150.   On March 19, 2007, Superior filed with the SEC a Form NT 10-K in which the Company announced that, due to an internal investigation regarding historical stock option practices spurred by the shareholder derivative action, the Company would be unable to timely file its Form 10-K for the year ended December 31, 2006.  Additionally, the Company admitted that its investigation had *"identified corrections that will be required to be recorded in the financial statements…"*  Specifically, the Company stated:

> On November 9, 2006, a derivative lawsuit was filed against the Company and certain present and former executives, officers and directors of the Company alleging that the grant dates for a number of the options granted to certain Company directors, officers and employees occurred prior to upward movements in the stock price, and that the stock option grants were not properly accounted for in the Company's financial reports and not properly disclosed in the Company's SEC filings. On December 5, 2006, a second derivative lawsuit was filed involving similar allegations. Very shortly after the filing of the first derivative lawsuit, to evaluate the merits of its allegations, the Company's management, under the oversight of the Audit Committee of the Board of Directors, and with assistance of outside counsel and forensic accounting experts, began conducting a comprehensive review of the Company's historical stock option grant practices. Although this review has been substantially completed, the Company will not be in a position to file its Annual Report on Form 10-K for the year ended December 31, 2006 (the "2006 Form 10-K") until after the completion of the review.

> **The Company has identified corrections that will be required to be recorded in the financial statements**, but has not yet determined the impact of the materiality to the financial statements and related footnotes. Based on the preliminary findings, the Company does not believe that the impact of these